102 F.Supp. 964 (1952)
SECURITIES & EXCHANGE COMMISSION
v.
RALSTON PURINA CO.
No. 8212(2).
United States District Court E. D. Missouri, E. D.
February 12, 1952.
Thomas B. Hart, Alexander J. Brown, Jr. and Robert J. Sugrue, Chicago, Ill., for Securities and Exchange Commission; Louis Loss, Associate Gen. Counsel, Securities & Exchange Commission, Washington, D. C.
Thomas S. McPheeters, St. Louis, Mo. (Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., of counsel), for defendant.
HULEN, District Judge.
This action, initiated by the Securities and Exchange Commission, resulted in a *965 preliminary injunction, by agreement, restraining defendant, Ralston Purina Company, from proceeding with the offering and sale of its $25 par value common stock. Plaintiff, after trial, seeks to have the injunction made permanent.
Section 5(a) of the Securities and Exchange Act, 15 U.S.C.A. § 77e, prohibits the offer or sale of any security in interstate commerce or through the mails unless a registration statement as to such security is in effect with the Securities and Exchange Commission, plaintiff in this action. Section 4(1) of the Act, 15 U.S.C.A. § 77d(1)[1] provides that transactions by an insurer not involving any public offering are exempt from the provisions of Section 5(a)(1) of the Act. Whether the stock issue in question was public or private is the issue in this case. Defendant claims it was not a public offering.
There is no conflict in the evidence. Defendant was organized in 1894. It had a small beginning. It manufactures and sells mixed feeds for poultry and livestock, and cereal for human consumption. It now has thirty-six feed mills, six soybean processing plants, three cereal plants, many warehouses and grain elevators and seventy-nine retail feed and farm supply stores. Approximately seven thousand people are employed. Net sales for the fiscal year ending September 30, 1951 exceeded $340,000,000.
Since 1942 the company has offered stock ownership to employees who could meet its test of "key employees". The company has from time to time paid a "President's bonus" to certain "key employees", and such employees, with rare exceptions, used the bonuses to purchase stock offerings made to them.
Defendant's Executive Vice-President gave the following as explanatory of what defendant means by the term "key employees", i. e., "those who were officers, department heads, assistants to a department head, or other employees whom the Company considered eligible for future promotion to a position of greater responsibility in an administrative, production, personnel, advertising, sales or research department  one who was ambitious and likely to develop and grow with the Company's business and who exercised special influence upon other employees and was a leader and advisor to other employees and was sympathetic to management."
To carry out its purpose of selling stock to "key employees" the defendant made known to its various managers and heads of departments a proposed stock offering. There was never any solicitation. The managers were depended upon to select "key employees" in their various departments, below their rank, after the company executives had conferred with the managers and outlined the matters to be considered in making selections. After the selections were made a notice was given of the stock offering. From the exhibits offered we conclude that since 1947, with total employees of approximately 7,000, purchases were made in 1947 by 243 employees; in 1948 by 20 employees; in 1949 by 414 employees; in 1950 by 411 employees. For 1951 there were applications to purchase by 165 employees. It is the latter sales that were stopped by this litigation. There were applications made by employees to whom no sales were made. There were offerings made each year to a larger number than ultimately purchased. Offerings were made orally. It is conceded the mails were used in carrying out this plan. Defendant kept no record of those to whom offerings were made and who did not purchase. It estimates the offering for the year 1951 to be approximately 500 "key employees", or 5 to 8% of the total employees.
The defendant's common stock is unlisted but there are over-the-counter sales to the public. Sales to "key employees" compare with estimated sales to the public, *966 based on month of September for each year, as follows:

 Over-the-Counter
 Yearly Sales
 (based on September Yearly Sales
 sales of to "Key
Year each year) Employees"
---- -------------------- -------------
1947 8,844 243
1948 1,200 1,120
1949 3,204 10,000
1950 8,544 9,659
1951 11,184 3,769

One reason given by defendant for selling stock direct to its "key employees" was that if they attempted to make like purchases over the counter, such demand would force the price up artificially.
Defendant at no time has sold stock to its employees to procure needed finances. Such sales were only for purpose of securing stock ownership by certain selected employees. In 1945 the defendant sold $10,000,000 in preferred stock to the public, by a public offering, after proper registration with the plaintiff. There is no evidence of any complaint from plaintiff or any stockholder, preferred or common, as to the character of financial statements of defendant.
Employees purchasing stock during the following years sold their stock thereafter as follows:

1947  317
1948  None
1949  89
1950  45

Sale of stock by employees, represented above, in most instances was by persons who left defendant's employ at time of sale.
Since 1945 defendant has sent to all stockholders its annual balance sheet statement. This statement was filed with the Commission. The defendant printed bimonthly bulletins. These were sent to all the branches, warehouses and stores and they were either posted or made available to all employees. Such bulletins showed the amount of tonnage which the company was currently producing and selling. Profit and loss statement was not shown by these bulletins.
The resolution providing for the stock issue in question, similar to resolution providing for stock offerings in previous years, is as follows: "Resolved, that Mr. Donald Danforth, Mr. Lewis B. Stuart or Mr. E. R. Siler be and each of them is hereby authorized to sell at $80 a share, not to exceed 10,000 shares of the authorized but unissued common stock of Ralston Purina Company to employees of Ralston Purina Company or Ralston Purina Company of Canada, Ltd. who shall, without any solicitation by the Company or its officers or employees, inquire of any of them as to how to purchase common stock of Ralston Purina Company; provided, however, that if such officer is able to purchase such stock for less on the open market he is authorized to purchase stock for such employee on the open market at such lesser price; provided further that this authorization shall terminate December 31, 1951."
No common stock was ever sold to any employee except those who were designated as "key employees". In 1951, when the managers and plant and department heads were advised of the stock being made available, in accord with the defendant's custom, only "key employees" were advised by manager and plant and department heads that such stock would be available for purchase by them.
Payroll classification of employees, determined by defendant at various times of stock offerings, as being "key employees" are: artist; copywriter; maintenance foreman; maintenance trainee; order-credit trainee; mill office clerk; loading foreman; chemist; research consultant; veterinarian; assistant in animal pathological department; secretary to production manager; stenographer to staff manager; clerical assistant to accounting manager; electrician-maintenance department; supervisor, mail section; millwright foreman; production trainee; shipping clerk; traffic clerk; and stock clerk.
Plaintiff's principal argument is based on committee reports and administrative rulings of plaintiff, as to the meaning that should be ascribed to the word "public" in the exemption clause of Section 4(1) of the Act. We are urged to follow *967 these extra-statutory pronouncements in determining the meaning of the statute. The practice does not appeal to us. We think it should be resorted to only in cases of extreme necessity when the recognized rules for statutory construction fail of their purpose. Language used by Congressional Committees is often loose. That observations of Congressional Committees will thereafter be used by the Courts to determine the meaning of laws passed by Congress cannot be said to have been in the minds of the Committee at the time of their pronouncements. Congress does not purposely pass a vague law. Committee declarations are not intended to be used for the purpose of determining the meaning of Congressional Acts by Congress. They do not represent any expression of either House of Congress. Committees of the two Houses may not agree upon the conclusions to be placed upon their actions. The latter is the case here. In 1934 the Securities Act was amended. At that time a proposal was made in the House to exempt stock issue sold to employees of the issuer. In Conference Report the House managers of the bill stated as a reason for rejection of the amendment: "[employees] may be in as great need of the protection afforded by availability of information concerning the issuer for which they work as are most other members of the public."
But when the same amendment was before the Senate the author of a like Senate amendment had the following colloquy with a member of the Senate Committee which considered the amendment:
"I agree that when the Senator submitted his proposed amendment it struck me as being entirely reasonable, fair and just. I took it that way. And I can see what he proposes in a favorable light. But when the bill went to conference the House Conferees insisted that there was, first, no reason for the amendment * * *
"The contention was, and it seems to me that it is almost unanswerable, that an offering to employees solely, as provided in the Senator's amendment, is not a public offering. The argument was made that there was no occasion for this amendment, because under the law there would not be a public offering when the stock was offered simply and solely to employees. And that was the effect of the Senator's amendment. His amendment is limited, as will be seen by its language, which is 
"`The term "public offering" shall not be deemed to include an offering made solely to the employees'
"`I do not believe under the law it really does.'
"Senator Hastings. May I inquire  and I make this inquiry because it may be helpful in the future  whether the Senator can say that that was the judgment of the conference itself, or is he speaking only for himself?
"Senator Fletcher. Yes; that is the judgment of the conference itself; that there is no reason why employees should not subscribe for stock, and stock be subscribed for by employees under the law as it is. And certainly there is no question in the world that the Commission has the authority to declare that such an offering would not be a public one."
The proceedings of the two Houses of Congress are in such conflict as to furnish no ground to recommend them as a help in determining the meaning of the Act before the Court.
In 1933 the Federal Trade Commission issued a release to the effect "Where a substantial number of persons is involved it would seem imprudent to rely on the exemption of Section 4(1) of the Act." Then in 1935 the plaintiff issued a release and again stressed numbers as determinative whether a stock offer by a corporation is private or public. And so plaintiff's brief informs us that it has consistently interpreted the term "public offering" as contained in the exemption clause to mean an offering to a substantial number of offerees. We find nothing in the statute and statutory scheme making number of offerees the sole test as to whether a stock offering is public or private.
The exemption statute was before the Court of Appeals for the Ninth Circuit in Securities and Exchange Commission v. *968 Sunbeam Gold Mines Co., 1938, 95 F.2d 699, 701. In the Gold Mines case the stock offering was made to all stockholders of two goldmining companies that were consolidating. The sole purpose of the offering was to raise finances to effect a consolidation. On the facts the authority gives little aid in the present case. But the opinion calls for serious consideration because of the position taken by the plaintiff as to the proper interpretation of the exemption statute  a position that is not now urged before this Court. We believe it far more plausible to believe that Congress has accepted the reasoning of the Gold Mines case as to the meaning of the statute and as the reason for failure to amend the Act and clarify its meaning, than that Congress accepted the administrative ruling as the reason for its non-action, as urged by plaintiff.
Based on the Gold Mines case we conclude defendant relying on the exemption has the burden of proof. The statute is designed to protect the investing public by providing "full and fair disclosure" and information as to the securities to be offered, which shall be available to the public and upon which it can base a decision as to purchase of stock offering. Therefore an exception to the general policy of the statute must be strictly construed against the claimant of the exemption. That plaintiff has conditioned registration on such terms and conditions as to make it expensive and time-consuming for defendant cannot be made of concern to this Court. Our province is only to interpret the law. Its reasonableness is not before us.
In the Gold Mines case the Court adopted certain norms of construction of the exemption in the Act which were there urged by the plaintiff: "* * * the word public `is one familiar to everyone, but of the most varied and indefinite connotations. In its broadest meaning the term "public" distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all red-headed men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less "public", in every realistic sense of the word, than an unrestricted offering to the world at large. Such an offering, though not open to everyone who may choose to apply, is none the less "public" in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which the selection is made. For the purposes of an offering of securities, red-headed men, residents of San Francisco, and stockholders of General Motors are as much members of the public as their antithetical counterparts. To determine the distinction between "public" and "private" in any particular context, it is essential to examine the circumstances under which the distinction is sought to be established and to consider the purposes sought to be achieved by such distinction.'"
We think this line of reasoning more in harmony with the statute than the arbitrary one of numbers, wholly absent in the Gold Mines case, and which plaintiff now asks this Court to adopt. An examination of the "circumstances under which the distinction is sought to be established" by the defendant and "the purposes sought to be achieved by such distinction" should be examined. We also consider  is there a "sensible relation to the purposes for which the selection" is made by the employer?
The circumstances of the offering under examination are plainly and frankly spread before the Court. They involve no promotion or cash-raising scheme by the defendant. They are the same circumstances that have surrounded a like activity for several years past. Defendant has followed a consistent policy of securing its managerial and executive personnel by promotion within the organization. Without competent management any business must fail. The success of defendant testifies to the soundness of its policy. It desires to continue the policy.
The sole purpose of the "selection" is to keep part stock ownership of the business *969 within the operating personnel of the business and to spread ownership throughout all departments and activities of the business. No greater tie, to secure loyalty, could be forged between the corporation and its employees than part ownership in the business by the employees. It is an appeal to the employees' self-interest, but a commendable one. Defendant could confine stock offerings to those high in the executive positions but that would not accomplish its long range purpose of bringing from the ranks those who represent good prospects for company management. Defendant chooses to call such prospects, together with those who are in executive positions, "key employees". Doubtless the name was suggested by the thought that such character of employees are the key to the company's success, past and present. We have examined defendant's definition of "key employee" and see nothing hypercritical or evasive in it. We do not need expert testimony to understand the purpose of the definition and its application to a private enterprise. Both are in accord with sound public policy. Under the definition it calls for an observation of employees whom the company considers "eligible for future promotion to a position of greater responsibility" in the various departments. They consider whether the prospect is "ambitious and likely to develop and grow with the Company's business" and who has a beneficial or "special influence" among other employees, and one who is "sympathetic to management" and has the interests of the employer at heart. No better way has been suggested to find "key employees", that is employees who look like good prospects as part owners to carry on and promote the success of the Company. What motive could the defendant have for such a policy other than the one announced? None has ever been suggested. The purpose of the selection bears a "sensible relation" to the class chosen.
We take it from the tenor of plaintiff's brief that if defendant had restricted its selection of "key employees" to less than 100, plaintiff would have no objections to the stock-offering as being a private one. Thus the issue is narrowed  is the stock-offering a public one because made to not to exceed 500 rather than not to exceed 100, out of 7,000 employees? To rule that it is would result in an arbitrary holding that any stock-offering made to offerees in excess of 100 would be public. Neither the statute nor any Congressional report suggests such a standard. It appears to have originated solely with plaintiff. But then what becomes of the test urged by plaintiff and set forth and approved in the Gold Mines case. Plaintiff may abandon the "common interest" and "sensible relation" doctrine but the Court of Appeals decision still stands binding on this Court unless clearly erroneous. We do not think it is clearly erroneous.
If the circumstances of this offering were such as even to suggest this corporation was taking advantage of its employees by either a false financial statement or failure to give any, we would have a different situation. If the circumstances surrounding the offering indicated it was being used to raise finances, we would have a different situation.[2] Defendant issues yearly financial statements. They go to all stockholders. They are filed with the plaintiff. The request to purchase stock for the year 1951 (Pre-Trial Exhibit F) is typical of the previous sales. We find five representatives of the financial department making applications to purchase stock. Their applications are in amounts proportional to the applications in other departments. Various departments are represented in the applications and the applications for the various departments we find usually are confined to those in a supervisory, managerial or executive capacity. Salesmen from the various divisions represent an exception. Such a diversification of stock ownership cannot be said to lack "sense" from the corporate viewpoint.
The circumstances of the plan of offering stock to "key employees" lacks the slightest suggestion of a device to evade the *970 law invoked by plaintiff. The offering has a lawful purpose entirely independent from the objective of the law.
Plaintiff emphasizes the failure of the resolution by terms to confine the offering to "key employees". This is the same type of resolution defendant has used for like offerings in previous years. The resolution is not the offering  it is authority for the offering. What was done  the facts regarding the manner and reason for the offering, rather than the resolution, show the nature of the offering to be private. Those facts are not in dispute.
We find the stock offering described in the complaint is private and not public under the terms of the Act.
We conclude that the offering is exempt from the provisions of the Act.
Decree may be submitted dismissing plaintiff's complaint and dissolving the temporary injunction.
NOTES
[1] "The provisions of section 77e of this title shall not apply to any of the following transactions:

"(1) * * * transactions by an insurer not involving any public offering; * * *."
[2] $35,918,134 in earnings were retained for use in business as of 1951; total assets $121,190,602; stockholders equity $78,173,030; cash on hand and in bank $10,297,569. (See Def. Ex. M)