# SECURITIES & EXCHANGE COMMISSION *v.* RALSTON PURINA CO.

No. 512.   Argued April 28, 1953.—Decided June 8, 1953.

*Roger S. Foster* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, John F. Davis* and *David Ferber.*

*Thomas S. McPheeters* argued the cause and filed a brief for respondent.

MR. JUSTICE CLARK delivered the opinion of the Court.

Section 4 (1) of the Securities Act of 1933 exempts "transactions by an issuer not involving any public offering" [1] from the registration requirements of § 5. [2] We must decide whether Ralston Purina's offerings of treasury stock to its "key employees" are within this exemption. On a complaint brought by the Commission under § 20 (b) of the Act seeking to enjoin respondent's unregistered offerings, the District Court held the exemption applicable and dismissed the suit. [3] The Court of Appeals affirmed. [4] The question has arisen many times since the Act was passed; an apparent need to define the scope of the private offering exemption prompted certiorari. 345 U. S. 903.

Ralston Purina manufactures and distributes various feed and cereal products. Its processing and distribution

---

[1] 48 Stat. 77, as amended, 48 Stat. 906, 15 U. S. C. § 77d.

[2] "SEC. 5. (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. . . ." 48 Stat. 77, 15 U. S. C. § 77e.

[3] 102 F. Supp. 964 (D. C. E. D. Mo. 1952).

[4] 200 F. 2d 85 (C. A. 8th Cir. 1952).

facilities are scattered throughout the United States and Canada, staffed by some 7,000 employees. At least since 1911 the company has had a policy of encouraging stock ownership among its employees; more particularly, since 1942 it has made authorized but unissued common shares available to some of them. Between 1947 and 1951, the period covered by the record in this case, Ralston Purina sold nearly $2,000,000 of stock to employees without registration and in so doing made use of the mails.

In each of these years, a corporate resolution authorized the sale of common stock "to employees . . . who shall, without any solicitation by the Company or its officers or employees, inquire of any of them as to how to purchase common stock of Ralston Purina Company." A memorandum sent to branch and store managers after the resolution was adopted advised that "The only employees to whom this stock will be available will be those who take the initiative and are interested in buying stock at present market prices." Among those responding to these offers were employees with the duties of artist, bakeshop foreman, chow loading foreman, clerical assistant, copywriter, electrician, stock clerk, mill office clerk, order credit trainee, production trainee, stenographer, and veterinarian. The buyers lived in over fifty widely separated communities scattered from Garland, Texas, to Nashua, New Hampshire, and Visalia, California. The lowest salary bracket of those purchasing was $2,700 in 1949, $2,435 in 1950 and $3,107 in 1951. The record shows that in 1947, 243 employees bought stock, 20 in 1948, 414 in 1949, 411 in 1950, and the 1951 offer, interrupted by this litigation, produced 165 applications to purchase. No records were kept of those to whom the offers were made; the estimated number in 1951 was 500.

The company bottoms its exemption claim on the classification of all offerees as "key employees" in its organization. Its position on trial was that "A key employee . . .

is not confined to an organization chart. It would include an individual who is eligible for promotion, an individual who especially influences others or who advises others, a person whom the employees look to in some special way, an individual, of course, who carries some special responsibility, who is sympathetic to management and who is ambitious and who the management feels is likely to be promoted to a greater responsibility." That an offering to all of its employees would be public is conceded.

The Securities Act nowhere defines the scope of § 4 (1)'s private offering exemption. Nor is the legislative history of much help in staking out its boundaries. The problem was first dealt with in § 4 (1) of the House Bill, H. R. 5480, 73d Cong., 1st Sess., which exempted "transactions by an issuer not with or through an underwriter; . . . ." The bill, as reported by the House Committee, added "and not involving any public offering." H. R. Rep. No. 85, 73d Cong., 1st Sess. 1. This was thought to be one of those transactions "where there is no practical need for [the bill's] application or where the public benefits are too remote." Id., at 5.[5] The exemption as thus delimited became law.[6] It assumed its present shape

---

[5] ". . . the bill does not affect transactions beyond the need of public protection in order to prevent recurrences of demonstrated abuses." Id., at 7. In a somewhat different tenor, the report spoke of this as an exemption of "transactions by an issuer unless made by or through an underwriter so as to permit an issuer to make a specific or an isolated sale of its securities to a particular person, but insisting that if a sale of the issuer's securities should be made generally to the public that that transaction shall come within the purview of the Act." Id., at 15, 16.

[6] The only subsequent reference was an oblique one in the statement of the House Managers on the Conference Report: "Sales of stock to stockholders become subject to the act unless the stockholders are so small in number that the sale to them does not constitute a public offering." H. R. Rep. No. 152, 73d Cong., 1st Sess. 25.

with the deletion of "not with or through an underwriter" by § 203 (a) of the Securities Exchange Act of 1934, 48 Stat. 906, a change regarded as the elimination of superfluous language. H. R. Rep. No. 1838, 73d Cong., 2d Sess. 41.

Decisions under comparable exemptions in the English Companies Acts and state "blue sky" laws, the statutory antecedents of federal securities legislation, have made one thing clear—to be public an offer need not be open to the whole world.[7] In *Securities and Exchange Comm'n* v. *Sunbeam Gold Mines Co.*, 95 F. 2d 699 (C. A. 9th Cir. 1938), this point was made in dealing with an offering to the stockholders of two corporations about to be merged. Judge Denman observed that:

> "In its broadest meaning the term 'public' distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all red-headed men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less 'public', in every realistic sense of the word, than an unrestricted offering to the world at large. Such an offering, though not open to everyone who may choose to apply, is none the less 'public'

---

[7] *Nash* v. *Lynde*, [1929] A. C. 158; *In re South of England Natural Gas and Petroleum Co., Ltd.*, [1911] 1 Ch. 573; cf. *Sherwell* v. *Combined Incandescent Mantles Syndicate, Ltd.*, 23 T. L. R. 482 (1907). See 80 Sol. J. 785 (1936).

*People* v. *Montague*, 280 Mich. 610, 274 N. W. 347 (1937); *In re Leach*, 215 Cal. 536, 12 P. 2d 3 (1932); *Mary Pickford Co.* v. *Bayly Bros.*, 68 P. 2d 239 (1937), modified, 12 Cal. 2d 501, 86 P. 2d 102 (1939).

in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which the selection is made. . . . To determine the distinction between 'public' and 'private' in any particular context, it is essential to examine the circumstances under which the distinction is sought to be established and to consider the purposes sought to be achieved by such distinction." 95 F. 2d, at 701.

The courts below purported to apply this test. The District Court held, in the language of the *Sunbeam* decision, that "The purpose of the selection bears a 'sensible relation' to the class chosen," finding that "The sole purpose of the 'selection' is to keep part stock ownership of the business within the operating personnel of the business and to spread ownership throughout all departments and activities of the business." [8] The Court of Appeals treated the case as involving "an offering, without solicitation, of common stock to a selected group of key employees of the issuer, most of whom are already stockholders when the offering is made, with the sole purpose of enabling them to secure a proprietary interest in the company or to increase the interest already held by them." [9]

Exemption from the registration requirements of the Securities Act is the question. The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.[10] The natural way to interpret the private

---

[8] 102 F. Supp., at 968, 969.

[9] 200 F. 2d, at 91.

[10] *A. C. Frost & Co.* v. *Coeur D'Alene Mines Corp.*, 312 U. S. 38, 40 (1941). The words of the preamble are helpful: "An Act To provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes." 48 Stat. 74.

offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which "there is no practical need for [the bill's] application," the applicability of § 4 (1) should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."

The Commission would have us go one step further and hold that "an offering to a substantial number of the public" is not exempt under § 4 (1). We are advised that "whatever the special circumstances, the Commission has consistently interpreted the exemption as being inapplicable when a large number of offerees is involved." But the statute would seem to apply to a "public offering" whether to few or many.[11] It may well be that offerings to a substantial number of persons would rarely be exempt. Indeed nothing prevents the commission, in enforcing the statute, from using some kind of numerical test in deciding when to investigate particular exemption claims. But there is no warrant for superimposing a quantity limit on private offerings as a matter of statutory interpretation.

The exemption, as we construe it, does not deprive corporate employees, as a class, of the safeguards of the Act. We agree that some employee offerings may come within § 4 (1), e. g., one made to executive personnel who because of their position have access to the same kind of information that the Act would make available in the

---

[11] See Viscount Sumner's frequently quoted dictum in *Nash* v. *Lynde:* " 'The public' . . . is of course a general word. No particular numbers are prescribed. Anything from two to infinity may serve: perhaps even one, if he is intended to be the first of a series of subscribers, but makes further proceedings needless by himself subscribing the whole." [1929] A. C. 158, 169.

form of a registration statement.[12]  Absent such a showing of special circumstances, employees are just as much members of the investing "public" as any of their neighbors in the community.  Although we do not rely on it, the rejection in 1934 of an amendment which would have specifically exempted employee stock offerings supports this conclusion.  The House Managers, commenting on the Conference Report, said that "the participants in employees' stock-investment plans may be in as great need of the protection afforded by availability of information concerning the issuer for which they work as are most other members of the public."  H. R. Rep. No. 1838, 73d Cong., 2d Sess. 41.[13]

Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable.  *Schlemmer* v. *Buffalo, R. & P. R. Co.*, 205 U. S. 1, 10 (1907).  Agreeing, the court below thought the burden met primarily because of the respondent's purpose in singling out its key employees for stock offerings.  But once it is seen that the exemption question turns on the knowledge of the offerees, the issuer's motives, laudable though they may be, fade into irrel-

---

[12] This was one of the factors stressed in an advisory opinion rendered by the Commission's General Counsel in 1935.  "I also regard as significant the relationship between the issuer and the offerees.  Thus, an offering to the members of a class who should have special knowledge of the issuer is less likely to be a public offering than is an offering to the members of a class of the same size who do not have this advantage.  This factor would be particularly important in offerings to employees, where a class of high executive officers would have a special relationship to the issuer which subordinate employees would not enjoy."  11 Fed. Reg. 10952.

[13] A statement entitled to more weight than different views expressed by one of the conferees in Senate debate.  See 78 Cong. Rec. 10181, 10182.

evance. The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose. The obvious opportunities for pressure and imposition make it advisable that they be entitled to compliance with § 5.

*Reversed.*

THE CHIEF JUSTICE and MR. JUSTICE BURTON dissent.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.