Daniel J. HIRTENSTEIN, Plaintiff,

v.

Jerry M. TENNEY and Shirley M. Tenney, Defendants.

No. 63 Civ. 3672.

United States District Court
S. D. New York.

April 14, 1966.

Chester A. Lessler, New York City, for plaintiff.

Dreyer & Traub, Brooklyn, N. Y., for defendants.

FRANKEL, District Judge.

On December 26, 1962, plaintiff bought from defendant Shirley M. Tenney 4,000 shares of Class A stock of Tenney Corporation for $20,000. On June 10, 1963, he wrote defendants, charging they had violated the Securities Act of 1933 because they had "suppressed and failed to disclose material facts concerning Tenney Corporation and concerning the stock", and demanded rescission. On December 19, 1963, following refusal of this demand, he brought this action. The complaint is in three counts, only the second of which is before us now on plaintiff's motion for summary judgment. This count alleges that the stock in question was not registered pursuant to Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e); accordingly, plaintiff claims, he is entitled under Section 12 of that Act (15 U.S.C. § 77l) to re-deliver the stock and have his money returned. For purposes of plaintiff's motion, the facts (viewing them, where there is conflict in the affidavits, favorably to defendants, Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962); 6 Moore, Federal Practice, § 56.-15(3) n. 7) may be summarized as follows:

Defendant Jerry Tenney, during the times in question, was a preponderant majority stockholder, director, and chief executive officer of the Tenney Corporation. His wife, defendant Shirley Tenney, acquired 41,238 shares of the corporation's Class A stock in 1960 as part of an exchange of 142,000 Tenney shares for the stock of Lasro Corporation, which, pursuant to the exchange, became a Tenney subsidiary.

A registration statement under the Act of 1933 relating to 1,932,880 shares of Tenney Class A stock became effective on September 14, 1960. The statement included an undertaking, stressed here by plaintiff, which said:

"In the event that the 142,000 shares of Class A stock issued for the stock of Lasro Corporation [including Mrs. Tenney's 41,238 shares] * * * are resold or re-offered to the general public, the * * * Registrant undertakes to file Post-Effective Amendments setting forth the terms of such re-offering. * * *"

On August 15, 1962, these 142,000 shares, together with some 60,000 others, were deregistered, with the Securities and Exchange Commission's approval, upon the Commission's understanding that none of the individual owners intended at the time to dispose of these holdings. The Commission cautioned in this connection that these holders "would still be required to comply with the registration requirements of Section 5 of the Securities Act of 1933 in the absence of an exemption therefrom."

At some unspecified time in 1962, Jerry Tenney came to know plaintiff's father, Edward Hirtenstein, an insurance broker, who expressed an interest both in buying some Tenney stock and in obtaining some of the corporation's insurance business. Tenney told Hirtenstein the company already had an insurance broker but was willing to consider the possibility of a replacement who could obtain the needed coverage on better terms. At a later date in 1962, Tenney told Hirtenstein that Mrs. Tenney had shares she was interested in selling; that these could be bought by Hirtenstein at a price slightly below the prevailing market

price; and that the seller would want an option to repurchase within two years at an advance of one dollar per share.

Late in 1962 Edward Hirtenstein said he would take 4,000 shares at five dollars per share, giving the seller an option to repurchase all or part of the lot within two years at six dollars per share. Then, on December 26, 1962, Edward Hirtenstein's son, the plaintiff herein, appeared at Tenney's office and announced that he had come to purchase the stock. Plaintiff explained that his father had told him of the prior negotiations and that he was ready to buy on the basis previously outlined. Plaintiff also produced a letter for Tenney's signature designating Interamerican Brokerage Corp. as insurance broker for the Tenney Corporation. Tenney refused to sign the letter, stating that there would be no stock sale if it was to be conditioned on such a brokerage designation. Later on the same day, plaintiff returned to Tenney's office, agreed to the sale and option without requiring the brokerage tie-in, and bought Mrs. Tenney's 4,000 shares. In a letter of the same date to Mrs. Tenney, he granted the repurchase option and acknowledged that no representations had been made to him "as to the financial condition of Tenney Corporation or as to its present or future cash distribution policy."

In a letter of March 20, 1963, requested by plaintiff's father, Interamerican Brokerage Corp. was authorized by the Tenney Corporation "to perform a comprehensive analysis of all insurance in force" for the corporation, its subsidiaries and affiliates. Thereafter, according to defendants, the brokerage corporation "[a]pparently * * * caused some confusion in that it tried to create the impression that it was in fact the broker for the Tenney Corporation." On April 22, 1963, the Tenney Corporation wrote one of its insurers to dispel this impression and affirm that its insurance business was still being handled by another

brokerage firm. It was this, defendants say, that led to the demand for rescission on June 10, 1963, and then to the present litigation.

As appears from the foregoing, it is not disputed that defendant Jerry Tenney, a dominating stockholder and officer of Tenney Corporation, handled the sale of his wife's shares to plaintiff. Building upon this—and arguing alternatively that Mrs. Tenney was herself a "controlling person"—plaintiff argues that the sale of these unregistered securities was in legal effect by the "issuer." As a further alternative, plaintiff argues that Mrs. Tenney should be viewed as an "underwriter" under the Act (see Section 2(11), 15 U.S.C. § 77b(11)), having acquired the shares "with a view to * * * distribution * * *." In either event, plaintiff contends, the sale without registration was unlawful under Section 5 of the Act (15 U.S.C. § 77e), creating his right of rescission under Section 12 (15 U.S.C. § 77l).

Opposing both theories, defendants contend that there was no "public offering" requiring registration under Section 5 of the Act—or, at least, that there is a genuine issue of material fact on this subject. We agree that the papers present such an issue, and, deciding no more, find this a barrier to the motion for summary judgment.

The legal framework of this issue is familiar. Section 4(2) of the 1933 Act (15 U.S.C. § 77d(2)) exempts "transactions by an issuer not involving any public offering."[1] Similarly, without a "public offering," there can be no liability as an "underwriter" (a "person who has purchased from an issuer with a view to * * * distribution"), "since a 'distribution' requires a 'public offering' * * *." Gilligan, Will & Co. v. Securities and Exchange Com'n, 267 F.2d 461, 466 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). Thus, on either of plaintiff's theories,

1. The reference in the text is to the statute as it was amended by the Act of August 20, 1964, 78 Stat. 580. The earlier text, which was, strictly speaking, applicable to the events in this case, was identical for our purposes.

830

he can prevail only if there was a "public offering" within that concept as it has developed under the Act.[2]

 There is no need on this motion to decide, and we do not decide, whether a single sale like the one in this case may be—or be part of—a "public offering." It is enough for now to say that "a decision of this issue involves a thorough development of the factual situation surrounding" the transaction and the offeree now suing. Knapp v. Kinsey, 249 F.2d 797, 801 (6th Cir. 1957), cert. denied, 356 U.S. 936, 78 S.Ct. 778, 2 L. Ed.2d 812 (1958). As is commonly true of paper presentations, the affidavits before us give less than a richly detailed account of either the cast or the action. It is not possible to know, for example, whether plaintiff (or his father) should be deemed to be in the limited class of informed persons "able to fend for themselves"—i. e., outside the "public" or "publics" for which the safeguard of registration was designed. S. E. C. v. Ralston Purina Co., 346 U.S. 119, 125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). On the other side, we are not told whether plaintiff was a lone offeree or one of several who may have been solicited; and while numbers may not be decisive, cf. S. E. C. v. Ralston Purina Co., supra, 346 U.S. at 125, 73 S.Ct. 981; Gilligan, Will & Co. v. Securities and Exchange Com'n, supra, 267 F.2d at 467, they are obviously relevant in applying the legislative purpose "to exempt isolated transactions from the onerous burdens of registration requirements." Woodward v. Wright, 266 F.2d 108, 115 (10th Cir. 1959).

 The one clear point, in short, is "that the determination whether a particular transaction involves a public offering depends not on any one factor but on all the surrounding circumstances." 1 Loss, Securities Regulation 654 et seq. (2d ed. 1961), collecting the administrative, judicial, and scholarly authorities. As plaintiff correctly observes, the bur-

den at trial is upon those claiming exemption. There is enough doubt in the papers, however, to preclude our holding that defendants will inevitably fail to sustain that burden.

The motion for summary judgment is denied.

So ordered.

---

**2.** Section 4(1) (15 U.S.C. § 77d(1)) exempts "transactions by any person other than an issuer, underwriter, or dealer." As we have noted, plaintiff seeks to reach one or both defendants under the "issuer" or "underwriter" category. There is no claim that either may be viewed as having been a "dealer."