SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

MIDLAND BASIC, INC., Midland Security, Inc., Donald P. Sandidge, a/k/a Don P. Sandidge, Phyllis J. Sandidge and Robert Moffet Walz, Defendants.

Civ. No. 64–27S.

United States District Court
D. South Dakota, S. D.

April 9, 1968.

John J. Kelly and Donald Malawsky, Denver, Colo., for plaintiff.

Richard Hopewell and Robert L. Jones, Sioux Falls, S. D., for defendants except Walz.

Robert J. Patterson, Jr., Sioux Falls, S. D., for defendant Walz.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

This is an action commenced by the Securities and Exchange Commission (hereinafter SEC) against the above named defendants for injunctive relief and the appointment of a receiver for the defendant Midland Basic, Inc. (hereinafter Midland Basic) due to alleged violations of the Investment Company Act of 1940, the Securities Act of 1933, and the Securities Exchange Act of 1934 (and rules and regulations promulgated pursuant to the latter).

The following facts were adduced at a trial to this court. Midland Security, Inc. (hereinafter Midland Security) was incorporated in the State of South Dakota on April 11, 1961, by Donald P. Sandidge and others for the primary purpose of providing an over-the-counter market place in which stockholders of South Dakota companies could sell as well as buy. The defendants, Donald P. Sandidge and Phyllis J. Sandidge, his wife, were both directors and officers of this corporation, and Donald Sandidge apparently continues to be so at the present time. A considerable portion of the assets of Midland Security was composed of stock of the Commonwealth Investment Company (hereinafter CIC), which was engaged primarily in the business of making small loans. Pursuant to a complaint filed by the SEC, a consent judgment was entered on August 8, 1963, against Midland Security, Donald Sandidge, Phyllis Sandidge and others, permanently enjoining them from, directly or indirectly, (in the offer for sale, sale, offer to purchase or purchase of the common stock of CIC) making use of the mails "to obtain money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, * * *."

Sometime in June of 1963, Donald Sandidge, disconcerted with the fact that CIC was in a position to declare only a very small dividend if one at all, approached CIC's board of directors and made the following proposal. It was suggested that the members of the board donate enough of their shares of CIC to the corporation so they would have an additional $100,000 for the purposes of declaring a larger dividend. This proposal was rejected. Subsequently, Donald Sandidge made another proposal with the same purpose in mind. It was explained to CIC's board that some of its treasury stock (carried at $4.00 per share) could be exchanged for stock in a company called Thermo Panel, Inc., at a value of $5.15 per share (which was Midland Security's bid price), thereby resulting in a gain of $1.15 per share which would also be available for dividend distribution. Sandidge also offered to sell Midland Security's CIC stock to CIC at $3.00 per share which Midland Security had purchased at $5.15. These suggestions were also duly rejected by CIC's board of directors.

The inability of CIC to declare a larger dividend added to the already unpopularity of its stock and thus Midland Security was placed in the quandry as to how to maintain a high and fairly stable price upon it.

On November 13, 1963, Midland Basic was incorporated in the State of South Dakota. Donald and Phyllis Sandidge were officers and directors of this corporation also. The business activity and policies of Midland Basic, as described in its prospectus, were declared to be as follows:

"While the Issuer has broad general powers under its Articles of Incorporation, such powers, being common to most corporations in South Dakota, it is primarily interested in investing, for the long term, in domestic securities which are available in primary issues and in over-the-counter markets, including that of the underwriter.

"In buying such domestic securities, the policy of the Issuer will, in the main, be to purchase such securities in established business operations, which securities have a relatively stable market value and reasonable prospects for growth and, possibly, earnings. Also to be considered in such investments will be the quality of management of the prospective business operations. It is the Issuer's intention to make such —'conservative'—investments with at least 90% of what proceeds are realized from this offering. It is our present intention to 'plough back' such earnings, if any, as might possibly occur, but there is and can be no guarantee as to growth or earnings or against loss to an investor.

"As to the remaining 10% or less of the proceeds which are realized from this offering, however, such will be invested in what might be considered as 'highly speculative' securities with an eye to rapid growth, but also with the hope that this 10% or less can be risked without any serious setback to the total investment picture of the Issuer. * * *"

A meeting of Midland Security's salesman (including the defendant Robert M. Walz) was conducted by Donald Sandidge in late November of 1963, at which time there was discussed the Midland Basic prospectus and the offering of its securities to the general public of South Dakota. The salesmen were told by Donald Sandidge that Midland Basic was to operate like a statewide mutual fund, a representation which was later conveyed by them to prospective purchasers.

A total of 26,000 shares at $5.00 per share composed the primary offering with Midland Security acting as underwriter. A secondary offering of 124,000 shares was to be made available for the account of Midland Security as a selling stockholder. As partial consideration for the 124,000 shares, Midland Security transferred to Midland Basic 80,000 shares of CIC at $6.00 per share, which it had purchased at $5.15 per share.[1]

Most of the original offering was sold to the public for a total of $117,890.00. From the amount received there was deducted an underwriting commission of $17,683.50. This left the sum of $100,-206.50 which, as per the books of Midland Security, was due and owing Midland Basic as of February 29, 1964. Donald Sandidge testified that only a "miniscule" amount was ever transferred over to Midland Basic to satisfy this obligation. In fact, almost all was expended for Midland Security's operational purposes, which included, among other things, the purchase of an additional $70,000 worth of CIC stock.

On February 29, 1964, Midland Security transferred to Midland Basic 9,664 shares of CIC at a valuation of $6.00 per share to partially satisfy its debt. This valuation was some $8,214.40 more than its original cost to Midland Security. The transaction was perfected by Donald Sandidge alone, in his capacity as president of both corporations. No other officer or director of either corporation was ever consulted. At this time Donald Sandidge had been informed of the dissatisfaction amongst CIC stockholders, and he himself was engaged in a campaign to oust CIC's management due to certain investments made by CIC and the fact that only a minimal profit had ever been realized during its existence.

An obligation of $42,222.50 remained due and owing from Midland Security to Midland Basic, which was subsequently almost entirely extinguished by the transfer to Midland Basic of shares of stock of the Tea Grain and Cattle Company and the Parks Insurance Company, which Midland Security had theretofore held. This transaction was accomplished by Donald Sandidge after having consulted with various people, the reason being that he had theretofore entered into a

1. The balance was eliminated by transfers at the same time of 1200 shares of a company called Parks Insurance Co., at $9.25 per share, 3500 shares of a company called Tea Grain and Cattle, at $10.00 per share, and $900 in cash.

voting trust relinquishing his voting right and was no longer a director of Midland Basic. At the time of the latter transfer, the Tea Grain and Cattle Company had been in existence for about one year and had not operated at a profit.

On March 5, 1964, the SEC filed its complaint, alleging certain violative practices on the part of the defendants which are hereinafter to be considered. The action against the defendant Walz was dismissed during the course of the trial, and any consideration as to his participation in these activities is therefore unnecessary.

Counts I and II of the complaint allege violations on the part of the defendant Midland Basic of the registration requirements provided for by the Investment Company Act of 1940 and the Securities Act of 1933, respectively. The other defendants are charged with aiding and abetting Midland Basic under Count I. The other defendants are charged with the same as Midland Basic under Count II. Section 7(a) (1) of the Investment Company Act of 1940 provides in pertinent part that no investment company organized "under the laws of * * * a State and having a board of directors, unless registered under section 80a–8, of this title, shall directly or indirectly * * offer for sale, sell or deliver after sale, by use of the mails * * * any interest in a security, * * * or offer for sale, sell, or deliver after sale any such security or interest, having reason to believe that such security or interest will be made the subject of a public offering * * *." 15 U.S.C. Sec. 80a–7(a) (1).

■ On June 23, 1964, some two and one-half months after this action had been commenced, Midland Basic became a registered investment company under Section 7(a) (1) of the Investment Company Act of 1940. This court is of the opinion that the question raised by Count I is therefore moot, even though Midland Basic's apparent purpose in registering was solely to satisfy the SEC. An examination of the complaint reveals that all reference to the relief asked for is prefaced on the fact that Midland Basic had not heretofore registered. It is true that the SEC in its prayer for injunctive relief under Count I does seek an injunction restraining the other defendants from such practices with respect to "any other unregistered investment company", but that relief is too broad in scope and cannot be made a subject of this proceeding.[2]

The defendant Midland Basic does contest the fact, however, that it is required to be registered under the Investment Company Act of 1940 and in no way admits that by its registration it is so required. The court feels that this determination is hereby necessitated, particularly because it is also determinative as to whether Midland Basic is exempted from the registration provisions under the Securities Act of 1933, which is the substance of the alleged violation under Count II. See 15 U.S.C. Secs. 77c(a) (11) & 80a–24(d).

■ It cannot be disputed that Midland Basic is an "investment company" within the meaning of the Investment Company Act of 1940. 15 U.S.C. Sec. 80a–3. It is thus required to be registered under 15 U.S.C. Sec. 80a–8 to enable it to make use of the mails in making sales, offers of sale, or delivery after sales, of its securities, 15 U.S.C. Sec. 80a–7(a), unless it comes within the purview of the exception. 15 U.S.C. Sec. 80a–3(c) (8) provides that the provisions of this subchapter (requiring registration, etc.) do not apply to "any company 90 per centum or more of the value of whose investment securities are represented by securities of a single issuer included

---

**2.** The section itself, Section 7(a), provides that "no investment company" shall make use of the mails, etc. In other words, the prohibition is directed at the company not its directors, officers, or the one who acts as the underwriter for the sale of the securities. They can be enjoined from such activity only as an incident to the association with the real party, i. e., the investment company.

within a class of persons enumerated in paragraphs (5), (6), or (7) of this subsection." [3] Inasmuch as the largest proportion of Midland Basic's investment securities was represented by CIC holdings, it must be established that this amounted to at least 90% of the value of its investment. Secondly, if that question be answered in the affirmative, CIC must be found to be included within one of those classes designated,[4] for Midland Basic to be entitled to the exception.

▄▄ At the outset, it should be noted that the burden of proving an exception is available is upon the defendants. Securities and Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S. Ct. 981, 97 L.Ed. 1494 (1953). Based upon the entire record, it appears abundantly clear that this burden has not been sustained. "Value", as defined by 15 U.S.C. Sec. 80a–2(a) (39), can mean "market value", "fair value", or "cost", depending upon when the security was acquired.[5] No showing was made to this court that a market quotation was readily available on CIC stock, nor for that matter was there really any market to speak of. Correspondingly, no determination whatsoever as to "fair value" was ever made by Midland Basic's board of directors. To adopt the standard of "cost" would be patently unjust in view of the fact that the figure of $6.00 per share was arbitrarily placed thereon by Donald Sandidge in his capacity as president of both corporations at the time the transfers from Midland Security to Midland Basic were made. A computation of the value of the CIC securities as well as the other Midland Basic holdings on the basis of "book value", the only reasonable standard which could be applied here, would reveal that less than 90% of the value were CIC securities.[6]

▄ Based upon the foregoing, it is the view of this court that Midland Basic is, in fact, required to be registered under the Investment Company Act of 1940 without the necessity of any further determination.

3. These three paragraphs provide as follows:

(5) Any person substantially all of whose business is confined to making small loans, industrial banking, or similar businesses.

(6) Any person who is not engaged in the business of issuing face-amount certificates of the installment type or periodic payment plan certificates, and who is primarily engaged in one or more of the following businesses: (A) Purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; (B) making loans to manufacturers, wholesalers, and retailers of, and to prospective purchasers of, specified merchandise, insurance, and services; and (C) purchasing or otherwise acquiring mortgages and other liens on and interests in real estate.

(7) Any company primarily engaged, directly or through majority-owned subsidiaries, in one or more of the businesses described in paragraphs (3), (5), and (6) of this subsection, or in one or more of such businesses (from which not less than 25 per centum of such company's gross income during its last fiscal year was derived) together with an additional business or businesses other than investing, reinvesting, owning, holding, or trading in securities.

4. See note 3 supra.

5. With respect to securities owned at the end of the last preceding fiscal quarter, for which market quotations are readily available, the market value is to be determinative; with respect to other securities and assets owned at the end of the last preceding fiscal quarter, fair value at the end of such quarter, as determined in good faith by the board of directors, is determinative; and with respect to securities and other assets acquired after the end of the last preceding fiscal quarter, the cost thereof is to be used. 15 U.S.C. Sec. 80a–2(a) (39).

6. 89,664 shares of CIC at $2.34 (Draeger audit), $209,813.76; 1,475 shares of Parks Insurance at $8.08, $11,918.00; 8,502 shares of Tea Grain and Cattle at $4.59, $39,024.18; total, $260,755.94. On this basis, approximately only 81% of the valuation of Midland Basic's investment securities are represented by those of CIC.

■■ As indicated above, Count II charges all defendants with violation of Sections 5(a) and 5(c) of the Securities Act of 1933 (15 U.S.C. Secs. 77e(a) & (c)), which provide as follows:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, * * *.

No registration statement as to Midland Basic's securities has ever been filed with the SEC. See 15 U.S.C. Sec. 77f. The record is clear that use of the mails was made in connection with the sale of Midland Basic's securities. Donald Sandidge testified that the mails were used in effecting transactions, including the mailing of the securities themselves after the purchases had been made. Violations of 15 U.S.C. Secs. 77e(a) & (c) have been conclusively established on the part of all the defendants.[7] For the reasons indicated supra, the exemption from the regulatory provisions of the Securities Act of 1933, more particularly 15 U.S.C. 77c (a) (11) (dealing with transactions solely within one state by a corporation in-

corporated by and doing business within the same state), is not available. See 15 U.S.C. Sec. 80a–24(d).

■ Counts V, VI, and VII of the amended complaint allege violations of Sections 17(a) (1), 17(a) (2), and 17(a) (3) of the Securities Act of 1933, respectively. (15 U.S.C. Secs. 77q(a) (1), 77q(a) (2), and 77q(a) (3).) Count VIII of the amended complaint charges the defendants with a violation of Section 10(b) of the Securities Exchange Act of 1934. (15 U.S.C. Sec. 78j(b) and Rule 17 C.F.R. 240.10b–5 promulgated thereunder.) These sections embrace the so-called antifraud provisions and provide as follows:

Section 17(a). It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10 (Securities and Exchange Act of 1934). It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) to use or employ, in connection with the purchase or sale of any security registered on a national se-

---

7. Phyllis Sandidge apparently never took an active part in these operations. She was a director of Midland Basic at one time, however, and it would seem that the statute is broad enough to include her within the purview of its prohibition.

curities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

    (1) to employ any device, scheme, or artifice to defraud,

    (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Here also the exemption provided for under the Securities Act of 1933 is not available to the defendants. 15 U.S.C. Sec. 77q(c). Correspondingly, there appears to be no exemption under the Securities Exchange Act of 1934. It seems clear that the defendants have been engaged in those practices which are specifically prohibited by the aforementioned provisions. It was stipulated by and between counsel for the respective parties that use of the mails was made in conjunction with the offer for sale of Midland Basic's securities. Use of the mails was also made to send to the investors the securities they had purchased. This was sufficient to fulfill that requirement of the statutes. Creswell-Keith, Inc. v. Willingham, 264 F.2d 76 (8 Cir. 1959). In other words, it is not necessary that the fraudulent representations actually be made through the mails. The terminology providing that it shall be unlawful for "any person" to "directly, or

indirectly", engage in such practices would seem to include all the defendants. The record is somewhat deficient of any evidence as to the association of the defendant Phyllis Sandidge other than the fact that she served as an officer and director of both Midland Basic and Midland Security, and presumably continues in such capacity with respect to the latter. This court is of the opinion, however, that no further proof was necessary. As was indicated earlier, the prospective investors were informed through the use of the prospectus, as well as orally, that Midland Basic would operate like a statewide mutual fund, affording the investors the benefits of diversification. At least 90% of the proceeds of the original offering was to be utilized for the purposes of making "conservative" investments. The proceeds were in fact, however, expended for Midland Security's purposes which included, among other things, the purchase of an additional $70,000 worth of CIC stock at a time when Donald Sandidge had no confidence or trust in its management. Midland Security, after having deducted a considerable underwriting commission, reduced the obligation owing to Midland Basic considerably by the transfer to Midland Basic of 9,664 shares of CIC at a sizable profit to Midland Security. Then too, it is significant that when Midland Basic was incorporated, some 80,000 shares of CIC were transferred to it by Midland Security at a valuation of $6.00 per share (purchased by Midland Security at $5.15) in exchange for 124,000 shares of Midland Basic which was to be available for the account of Midland Security as a stockholder. This transaction also amounted to a rather obvious gain to Midland Security, although how much of it was in fact realized, if any, was never indicated.

Obviously, these transactions were not by any means at arm's length. The officers and directors were essentially the same for both corporations with Donald Sandidge in a position of control. Midland Basic was, as the SEC main-

tains, no more than a "captive buyer." It is readily apparent that Midland Basic's only real purpose was to provide a place to unload CIC stock at a profit to Midland Security which could not be accomplished on an open market.

Count IX of the amended complaint charges the defendant Midland Security with a violation of Section 15 (c) (1) of the Securities Exchange Act of 1934. 15 U.S.C. Sec. 78o(c) (1) and Rule 17 C.F.R. 240.15c1–2(a). Section 15(c) (1) provides in pertinent part that "(n)o broker or dealer shall make use of the mails * * * to effect any transaction in, or to induce the purchase or sale of, any security" by means of any "manipulative, deceptive, or other fraudulent device or contrivance." The term "manipulative, deceptive, or other fraudulent device or contrivance," is defined to include any "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. 240.15c1–2. As was noted, use of the mails was made in effecting transactions of Midland Basic's securities. Here again, it is not necessary that the fraudulent representations actually be made through the mails. Creswell-Keith, Inc. v. Willingham, supra. It would seem that the disparity between the representations made in the Midland Basic prospectus which was shown to the prospective investors, as well as the oral communications, and what in effect actually transpired is, in itself, sufficient to constitute a violation of this section. Had Midland Security, as underwriter for the original offering, been completely independent of Midland Basic and its operations, a closer question would have been presented. Such is not the case here.

Finally, Counts III and IV of the complaint charge the defendants Donald Sandidge and Phyllis Sandidge with violations of Section 9(a) of the Investment Company Act of 1940 (15 U.S.C. Sec. 80a–9), which provides in part as follows:

(a) It shall be unlawful for any of the following persons to serve or act in the capacity of officer, director, * * * of any registered investment company, * * *:

(2) any person who, by reason of any misconduct, is permanently or temporarily enjoined by order, judgment, or decree of any court of competent jurisdiction from acting as an underwriter, broker, dealer, or investment adviser, or as an affiliated person, salesman or employee of any investment company, bank, or insurance company, or from engaging in or continuing any conduct or practice in connection with any such activity or in connection with the purchase or sale of any security; * * *.

At the time of its incorporation, both Phyllis and Donald Sandidge were officers and directors of Midland Basic. It is not clear from the record, but it appears that they continued to occupy such positions until sometime after the SEC had filed its complaint. At the time of trial, Donald Sandidge testified that he remained as manager of Midland Basic and was somewhat active in its affairs.

As was indicated before, Midland Basic is at present registered under the Investment Company Act of 1940 and is required to be so.

Of the utmost importance is the effect of the consent judgment entered in August of 1963 and the reason for its issuance. Alleged in that complaint relative to the Sandidges were violations of Section 17(a) of the Securities Act of 1933 (15 U.S.C. Sec. 77q(a)), and Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. Sec 78j(b) and Rule 17 C.F.R. 240.10b–5), which sections have been heretofore set out. Although the defendants, Donald and Phyllis Sandidge, did not, by their consent to the entry of judgment enjoining them from certain acts and practices, specifically admit that they had been in violation of those provisions, it appears doubtful that they would have consented to the relief sought had they not been in violation thereof. In that action the SEC could have proceeded with the proof it had, which presumably would have ultimately

culminated in the same result. This court is therefore of the opinion that the earlier judgment was in fact entered by reason of misconduct. To hold otherwise would be tantamount to saying that the SEC is required to litigate fully each and every action, which would impose an unreasonable burden upon it and disregard in toto the purpose Congress had in mind in enacting these provisions. Both of the Sandidges have therefore been in violation of Section 9(a) of the Investment Company Act of 1940.

█ In considering the issuance of a permanent injunction enjoining the defendants from certain acts and practices prohibited by the provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, there must be found in addition to the fact that violations have occurred, a reasonable likelihood or expectation that such acts will be continued. Securities and Exchange Commission v. Cohn, 216 F.Supp. 636 (D.C.1963); Securities & Exchange Commission v. Franklin Atlas Corp., 171 F.Supp. 711 (D.C.1959). This must of necessity be determined on the basis of past conduct. Although both Midland Basic and Midland Security have been temporarily restrained from conducting their respective business operations pending the outcome of a decision on the merits of this case,[8] the evidence would indicate that unless the defendants are permanently enjoined, such illegal acts will continue. It is true that at the time of trial, the defendant Phyllis Sandidge was not a director or an officer of the defendant Midland Basic and was not then in violation of Section 9(a) of the Investment Company Act of 1940. That a violation

had occurred, however, was proved, and it would seem not unreasonable that she again become a director of a registered investment company.

█ This court is of the opinion that a permanent injunction pursuant to the applicable subchapters of the securities laws (15 U.S.C. Sec. 77t(b); 15 U.S.C. Sec. 78u(e); 15 U.S.C. Sec. 80a–41(e)) be issued as against all defendants. The order of the court should so provide.

██ There remains for consideration the question of the propriety of appointing a receiver for the defendant Midland Basic. The only statutory provision authorizing such a procedure is Section 42(e) of the Investment Company Act of 1940 (15 U.S.C. Sec. 80a–41(e)), which is not applicable here. The district court is, however, vested with inherent equitable power to appoint a trustee-receiver upon a prima facie showing of fraud and mismanagement. Securities and Exchange Commission v. Keller Corporation, 323 F.2d 397 (7 Cir. 1963). That showing was made to the satisfaction of this court. A receiver shall be appointed of all records, claims and assets of the defendant Midland Basic for the protection of its stockholders who have been made the subject of this fraudulent scheme.

Counsel for the plaintiff is directed to prepare an order providing for the permanent injunction and appointment of a receiver which shall be consonant with Rules 65(d) and 66 of the Federal Rules of Civil Procedure and this opinion.

This memorandum decision will constitute the court's findings of fact and conclusions of law.

---

8. This was pursuant to an order of this court dated August 10, 1964. The defendant Midland Security was allowed, however, to incur obligations and make expenditures not to exceed a total of $2000.00.