GENERAL LIFE OF MISSOURI
INVESTMENT CO., Appellee,

v.

John K. SHAMBURGER, Appellant.

No. 76–1168.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 15, 1976.

Decided Dec. 15, 1976.

John J. Haley, Little Rock, Ark., for appellant; William L. Buffalo, Little Rock, Ark., on the brief.

Cullen Coil, Jefferson City, Mo., for appellee; Wayne W. Owen, Little Rock, Ark., on the brief.

Before STEPHENSON and HENLEY, Circuit Judges, and MARKEY,* Chief Judge.

MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.

This appeal by the defendant, John K. Shamburger,[1] is from the judgment[2] of the District Court for the Eastern District of Arkansas that the plaintiff corporation, General Life of Missouri Investment Co. (hereafter GLMIC), recover of Shamburger the sum of $25,250 as damages for breach of an unregistered corporation stock subscription agreement plus the costs of the action. The executory subscription agreement is admittedly a "security" within the definitions in § 2 of the Securities Act of 1933, as amended, 15 U.S.C. § 77b.[3]

The first issue on appeal is whether GLMIC has carried its burden of proving that the offer and sale of stock and the subscription agreement in one of two Missouri corporations, each involving 25 investor-incorporators or less, is exempt under federal law, when merger of the corporations was intended from the beginning, the venture involved at least 42 investor-incorporators, and the number and knowledge of all offerees was not established. The district court "hesitatingly" determined this "close question" in the affirmative. We reverse.

Because we hold that the transactions involving the subscription agreement sued upon were not "exempted transactions" under § 4(2) of the Securities Act of 1933

---

* HOWARD T. MARKEY, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. Shamburger has been found to be knowledgeable in the fields of forming insurance companies, issuance of insurance company securities, and acquisition of control as well as mergers of corporations. Shamburger v. Moody, 322 F.Supp. 196, 199 (E.D.Ark.1970), aff'd per curiam, 437 F.2d 1358 (8th Cir. 1971).

2. The district court's decision is unreported. The lower court held a two-day nonjury trial, made certain findings of fact and conclusions of law from the bench, and made further findings and conclusions in a letter Memorandum sent to the parties.

3. 15 U.S.C. § 77b. Definitions.
    When used in this subchapter, unless the context otherwise requires—
    (1) The term "security" means any * * stock, treasury stock, * * * or right to subscribe to or purchase, any of the foregoing.

(Act), as amended, 15 U.S.C. § 77d[4] (because they were part of an unregistered "public offering" violative of § 5 of the Act, 15 U.S.C. § 77e[5]), we must also decide whether Shamburger's subscription agreement is nonetheless enforceable. We answer in the negative.[6]

### Background

Prior to the formation of GLMIC's corporate predecessor, Glen A. Jordan[7] had established two successful insurance companies: Republic Investors Life Insurance Company in East Moline, Illinois and General Life of Iowa Investment Co. in Bettendorf, Iowa. Shamburger, a lawyer in Little Rock, Arkansas, was a stockholder and board member of Republic Investors and had performed minor legal services for that corporation. Jordan wanted to expand insurance operations into other states, such as Missouri. In December, 1962, Jordan began organizing a new Illinois corporation, named General Republic Corporation of America, which was to be a holding company for a future Missouri insurance company. Jordan telephoned Shamburger at his office in Little Rock and asked him to invest in stock of General Republic. Shamburger invested $10,000 in cash and $30,000 in marketable securities. Including Shamburger, there were 25 incorporators and original investor-stockholders in General Republic.

The next event was the January, 1963 dissolution, upon Jordan's recommendation, of General Republic because that corporation was unable to obtain a charter for a life insurance company in Missouri. Also in January, 1963, Jordan formed a new Missouri corporation named General Life of Missouri Investment Co. (not plaintiff GLMIC, though identically named). It too had 25 incorporators, of which 15 (including

4. 15 U.S.C. § 77d. Exempted transactions.
   The provisions of section 77e [note 5, *infra*] of this title shall not apply to—
   \* \* \* \* \* \*
   (2) transactions by an issuer not involving any public offering.
   [The 1964 and 1975 amendments did not affect the substance of this provision.]

5. 15 U.S.C. § 77e.
   Prohibitions relating to interstate commerce and the mails.
   (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
   (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
   (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.
   (b) It shall be unlawful for any person, directly or indirectly—
   (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or
   (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.
   (c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use of medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

6. We find it unnecessary to reach the additional issues raised in the briefs and arguments before us: whether the securities law of the State of Arkansas was applicable to the offer and sale of these securities; whether GLMIC complied with the Missouri Securities Act in the offer and sale of these securities; whether Shamburger can rely upon misrepresentations made in connection with the offer and sale of these securities; and whether the district court erred in assessing GLMIC's damages at $.25 per share.

7. Jordan did not testify. Shamburger's counsel stated to the trial judge that a subpoena had been issued but that it had been impossible to serve it upon Jordan.

Shamburger) were carried forward, with their investments, from the dissolved General Republic.

For some reason (apparently an inability to achieve registration in Missouri), General Life of Missouri was dissolved at a shareholders meeting on March 21, 1963, in Bettendorf, Iowa. At that meeting, Jordan and Nicholas Monaco, his attorney, explained a stepwise plan to create two new Missouri corporations. Shamburger's testimony recounted these events at the meeting:

The only company that actually was formed at that time or at least calls and waivers and articles distributed was the General Republic Investment Company, the present plaintiff['s predecessor].

Now, everybody understood and it was explained that the life company would follow.

Q Now, who explained this?

A Jordan and Monaco were the principal speakers at this meeting. Everybody else was asking questions. I did more questioning at this meeting because both of the others [referring to General Republic Corp. of America and the first General Life of Missouri Investment Co.] involved a public registration of the securities in which I as an investor knew that disclosures would be made that would be material and I wouldn't have to be rubbing for information.

When I found out they did not intend initially to register this company I asked a whole lot of questions as did most everybody else there. And the persons answering the questions were Mr. Monaco and Mr. Jordan.

\* \* \* \* \* \*

Q You were stating that you were assured that the securities issued by General Republic would be registered.

What other statement or representations were made to you and other investors at the Bettendorf meeting and by whom?

A There are two other areas that I made extensive inquiry into from both Mr. Monaco and Mr. Jordan, Mr. Oates,

Mr. Litton and this fellow Wilson, I believe, was the other fellow at the time that was their inside man.

The first one of those had to do with Mr. Jordan's controlling stock. Heretofore, I hadn't been concerned because they were being registered and I knew there'd be total disclosure.

In this instance, I asked what kind of stock he was going to get, what his par value was, what kind of preferences or right it had, and I was informed exactly what appears in the articles of incorporation.

That it would be voting stock only, no dividend rights, no liquidation rights and I was further informed that Mr. Jordan was holding that block of stock for the benefit of all the incorporation [sic, incorporators].

And I'm the guy that made the inquiry what happens in the event of your death and Mr. Jordan assured us and the whole group there—not just me—that that stock—he'd fix it where it would revert to the company in his will.

Whether he did or not, I have no idea. It was to revert to the company in the event of his death.

Now, the next thing I had specific inquiry about was the operation of this company. Subscriptions, the controlling stock and the operation.

Mr. Jordan assured me there was not going to be any big salaries, there were not going to be any big expense accounts, no big lawyer fees, not going to be any huge and monstrous sales commissions paid and this life insurance company would start making money from the day one because everybody was going to pull their belt in. The company belonged to a group of agents and executives of his company and it was going to be run as efficiently and economically as possible. [Bracketed matter added.]

Shamburger's account of the Bettendorf meeting was corroborated by another witness, Virginia McHenry, who was Jordan's administrative assistant and considered to

be on the executive staff at the time. Mrs. McHenry testified, without contradiction, that General Life of Missouri was dissolved in the morning and that the formation of the two new companies was discussed in the afternoon session.

The first new corporation was named General Republic of Missouri Investment Co. (GLMIC's predecessor). It was incorporated March 28, 1963 by 25 incorporators (including Shamburger) who collectively made stock purchases (not subscriptions) totaling approximately $365,000. The second new corporation was named General Life of Missouri Insurance Co. It was incorporated in April, 1963 by 23 incorporators (including Shamburger and 5 other incorporators of GLMIC's predecessor) who collectively made stock purchases (not subscriptions) totaling approximately $380,000. Thus there were 42 individuals investing approximately $745,000 in the two corporations.

Shamburger's original investment in the dissolved General Republic, which had been carried forward into the dissolved General Life of Missouri, was further carried forward and split between the two new Missouri corporations. General Republic of Missouri Investment Co. originally had authorized 875,000 shares of class A stock (par value $1) and 1,000,000 shares of class B stock (no par value). Jordan owned a block of class A common stock and all of the class B "control" stock which had equal voting rights.

On March 29, 1963, each of the 25 incorporators and investors in General Republic of Missouri Investment Co. (plaintiff's predecessor) agreed to subscribe for additional shares of class A common stock having a total contract price of $1,950,000. Shamburger's subscription agreement, in the amount of $150,000, is the subject of

this suit. It was mailed to Shamburger in Little Rock from the corporation's office in Florissant, Missouri, and was signed by Shamburger in Arkansas.

Shares of General Republic of Missouri Investment Co. were issued to 6 more investors in the first year after incorporation and to 13 more investors in the next year. Included in these 19 additional investors were all of the 17 incorporators of General Life of Missouri Insurance Co. who had not been incorporators of the investment company. These individuals exchanged their stock in General Life of Missouri Insurance Co. for stock in General Republic of Missouri Investment Co., thereby making the insurance company a wholly-owned subsidiary of the investment company.

Summarizing the chronology of corporations: [8]

1. General Republic Corporation of America (Illinois)
   Formed: December, 1962. Incorporators: 25.
   Dissolved: January, 1963.

2. General Life of Missouri Investment Co. (Missouri)
   Formed: January, 1963. Incorporators: 25.
   Dissolved: March 21, 1963.

3. General Republic of Missouri Investment Co. (Missouri) (plaintiff's predecessor)
   Incorporators: 25. Investment: $365,000.
   Formed: March 28, 1963. Subscriptions: $1,950,000.

4. General Life of Missouri Insurance Co. (Missouri)
   Formed: April, 1963.
   Incorporators: 23. Investment: $380,000.
   (1965—became wholly-owned subsidiary of General Republic of Missouri Investment Co.)

### Stipulated Facts

The parties stipulated to the following facts material on this appeal:

\* \* \* \* \* \*

6. That on December 29, 1965, defendant assigned to Bryce F. Allbright, Jr. his right to purchase 10,000 of the 150,000 Class A shares referred to in [the sub-

---

8. Considering all four corporations listed, a total of 46 individual investors were involved. Many investors were incorporators of two or more corporations. Jordan, Shamburger, and two others were incorporators of all four corporations. In 1966, General Republic of Missouri Investment Co. merged with American Independence Insurance Co. The latter corporation was the survivor and its name was

changed to General Life of Missouri Investment Co., the plaintiff (GLMIC) herein. Later in 1966, Jordan sold his stock in the plaintiff corporation, including all of the class B "control" stock, to the Guaranty Bond and Finance Company. The present suit was filed on March 9, 1973. According to statements made during the trial in July, 1975, GLMIC "merged" with Guaranty Bond and Finance in February, 1974.

scription agreement] after a stock split mentioned in Paragraph 5 hereof.

That on April 14, 1966, defendant assigned to Bennie Beard his right to purchase 10,000 shares of Class A stock and to H. Gingrich his right to purchase 4000 shares of Class A stock.

\* \* \* \* \* \*

12. Defendant was elected a member of the board of directors of General Republic of Missouri Investment Company at the first meeting of incorporators, was re-elected to the board in 1964, and formally resigned August 13, 1965.

13. Defendant was one of several attorneys employed by the board of directors of General Life of Missouri Insurance Company (a company wholly owned by General Republic of Missouri Investment Company) on June 3, 1963, and as such was to receive $100.00 per month plus a sum equal to one-half of one percent of the first year annual premium income. He actually received $1,400.74.

14. Defendant signed a proxy for the voting of his shares, on April 21, 1966, for the merger of General Republic of Missouri Investment Company with American Independence Investment Company.

15. Defendant did not bring any action at any time previous to the filing of this action to rescind the transaction whereby he purchased stock of General Republic of Missouri Investment Company and whereby he received and signed the subscription agreement with that company. [Bracketed matter added.]

The parties also filed these material "supplemental" stipulations:

1. The stock subscription agreement \* \* \* was not registered under the federal securities laws, the Missouri securities laws, or the Arkansas Securities Act, and no exemption from registration under the Arkansas Securities Act was sought or obtained by the plaintiff.

2. The plaintiff pursuant to Paragraph 2 of said subscription agreement made [certain] calls for payment of subscriptions prior to March 29, 1968. [Bracketed matter added.]

*The District Court*

The combined findings of fact and conclusions of law, delivered orally by the district court and material on this appeal, may be summarized as follows: [9]

1. Shamburger entered into a binding subscription agreement with GLMIC.

2. Jordan made certain representations concerning a plan to register the securities, but Shamburger cannot rely upon those representations because Jordan had no authority to bind GLMIC.

3. GLMIC made a good faith effort to register the securities with the State of Missouri.

4. Registration was not a condition precedent to Shamburger's obligation under the subscription agreement.

5. The law of the State of Missouri and the pertinent federal statutes control with respect to registration requirements.

6. Under the facts of this case, the securities were not required to be registered under the laws of the State of Missouri. The provisions of the Missouri statute were carefully followed in order to exempt the securities from registration.

7. Registration under the Federal Securities Act of 1933 is "a close question." "Nevertheless, I hesitatingly conclude the securities were also exempt under the federal statute."

OPINION

I. *The Private Offering Exemption.*

■ In adopting the Act, Congress signalled its desire to protect investors by insuring full and fair disclosure in connection with the offer and sale of securities. As the Supreme Court stated in *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.,* 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500 (1941):

---

9. The district court's Letter Memorandum was primarily concerned with the measure of damages, but included a statement that Shambur-

ger was in fact "very poorly informed" on the transactions in issue.

The essential purpose of the statute is to *protect investors* by requiring publication of certain information concerning securities *before* offered for sale. [Emphasis added.]

Congress perceived, however, that in certain situations the protections provided by the Act were not needed. Regarding the specified exemptions, such as the private offering exemption found in § 4(2), the House Report stated: "The Act carefully exempts from its application certain types of * * * securities transactions where there is no practical need for its application or where the public benefits are too remote." H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933).

In *SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), the court first acknowledged that "[t]he Securities Act nowhere defines the scope of § 4[2]'s private offering exemption" (*Id.* at 122, 73 S.Ct. at 983) and then interpreted the exemption in light of the basic legislative purpose as follows (*Id.* at 124–25, 73 S.Ct. at 984):

Exemption from the registration requirements of the Securities Act is the question. The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which "there is no practical need for [the bill's] application," *the applicability of § 4[2] should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to*

fend *for themselves is a transaction "not involving any public offering."* [Emphasis added and footnote omitted.]

■ Resting the burden of proof upon the issuer, the Court emphasized access to the kind of information provided offerees by a registration statement, stating (346 U.S. 126–27, 73 S.Ct. 985):

Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable. *Schlemmer v. Buffalo, R. & P.R. Co.,* 205 U.S. 1, 10, 27 S.Ct. 407, 408, 51 L.Ed. 681 (1907). Agreeing, the court below thought the burden met primarily because of the respondent's purpose in singling out its key employees for stock offerings. But once it is seen that the exemption question turns on the knowledge of the offerees, the issuer's motives, laudable though they may be, fade into irrelevance. The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose. The obvious opportunities for pressure and imposition make it advisable that they be entitled to compliance with § 5.

■ Many courts [10] have applied the Supreme Court's "focus of inquiry" in determining whether a given transaction involves a public offering within the meaning of § 4(2) of the Act and have based their decisions on the presence or absence of the offerees' need for the protections afforded by registration, i.e., whether the offerees

---

10. See, e.g., *Parvin v. Davis Oil Co.,* 524 F.2d 112, 118 (9th Cir. 1975) ("A private offering is one where the investors do not need the protection of the Act because they already have access to the kind of information that would be contained in a registration statement."); *SEC v. Dolnick,* 501 F.2d 1279, 1282 (7th Cir. 1974) ("[W]hether an offering is public does not depend on how many shares are offered, but on whether the buyer has need for the protections of the Act."); *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 n.12 (2nd Cir. 1973); *Andrews v. Blue,* 489 F.2d 367, 373 (10th Cir. 1973); *Hill York Corp. v. American Internat'l Franchises, Inc.,* 448 F.2d 680, 688–89 (5th Cir. 1971); *United States v. Custer Channel Wing Corp.,* 376 F.2d 675, 678–79 (4th Cir.), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); *SEC v. Tax Service, Inc.,* 357 F.2d 143, 144–45 (4th Cir. 1966); *Garfield v. Strain,* 320 F.2d 116, 119 (10th Cir. 1963); *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 466 (2nd Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

were shown to have access to the kind of information the registration statement (§ 7 of the Act, 15 U.S.C. § 77g) would disclose. We find no reason to depart from that decisional approach in this case.

As above indicated, the district court "hesitatingly" concluded that the transactions were exempted under § 4(2) after noting that it was "a close question." Contrary to GLMIC's argument, the lower court made no specific or firm findings of fact on this issue, no findings respecting the need of all involved investors for the kinds of information provided by registration, and no finding that only 25 or 42 offerees were involved. Hence we have reviewed the entire record. The relevant testimony is unchallenged as to veracity. It is not necessary, therefore, that we determine any finding of fact below to have been clearly erroneous or that we resolve any conflicts in testimony.

It was stipulated that the subscription agreements were not registered. The record establishes that the mails and interstate telephone calls were used in the offer and sale [11] of the corporate stock and of the stock subscription agreements in 1962 and 1963. The evidence is also clear that the various offerees resided in Missouri and in several adjacent states. Hence, there is no question that "means or instruments" of interstate commerce were employed.

Disregarding the formation and dissolution of earlier corporations, it is clear that the discussions at the meeting held in Bettendorf, Iowa on March 21, 1963 demonstrate that the key man, Jordan, had conceived and was implementing at that meeting an integrated plan for the formation of two corporations, with the stated, ultimate purpose of making one a holding company and the other its wholly-owned subsidiary. The plan involved a total of 42 investors who would effectively invest approximately $745,000 in the unified venture. Some 25 of those investors were to subscribe for an additional $1,950,000 worth of stock in the holding company (plaintiff's predecessor).

■ The record indicates that a few of the 42 investors were Jordan's close associates and key officers in the new corporations. Though it is not clearly established in the record, these few may have been true insiders and may have had access to the relevant information. Though GLMIC argues before us that Shamburger was an "insider," no effort was made at the trial to prove that Shamburger was a true insider having no need for the information required in a registration statement. We do not find clearly erroneous the district court's view that Shamburger had only limited information about plans for the new corporations. Shamburger's probing questions at the Bettendorf meeting indicated an effort to learn at that point what was going to happen. Though a board member, and an attorney for the corporations for a limited time, and though he voted for the 1966 merger, these factors are insufficient to constitute Shamburger a true insider. The other investors were estimated by Mrs. McHenry to be 25% home office employees and 75% sales representatives, such as regional directors and state sales directors of the existing Jordan insurance companies in Illinois and Iowa.

Most importantly, GLMIC did not meet its burden of establishing that all of the offerees in this case already had access to the kind of information that would appear in a registration statement. GLMIC did not establish how many offerees there were, or even how many investors were present at the Bettendorf meeting to receive the limited information disclosed in response to Shamburger's questions. Shamburger estimated that 15 to 20 people were present, less than half of the 42 investors involved in the venture planned at that meeting. Beyond the particular questions asked at that meeting, there is no evidence that any of the non-insider, lower-level employees, who became investors or that any

---

11. The term "sale" includes "every contract of sale or disposition of a security or interest in a security, for value." § 2(3), Securities Act of 1933, as amended, 15 U.S.C. § 77b(3) ("Definitions.").

offerees who did not become investors,[12] had access to any of the relevant financial information which would be disclosed in a registration statement.

Applying § 4(2) of the Act, as it has been interpreted by the Supreme Court in *Frost & Co., supra,* and *Ralston Purina, supra,* to the facts in this case, we hold that the offer and sale of the instant subscription agreement was involved in a public offering. GLMIC, the issuer, failed to carry its burden of proving that the class of offerees had access to the kinds of information which registration would disclose. The meager evidence of defendant that he acquired some information at the Bettendorf meeting did not serve to satisfy that burden and is clearly insufficient to meet the public purpose of the Act. The private offering exemption under § 4(2) of the Act was therefore not available to the issuer, GLMIC, and the offer and sale of the subscription agreement to Shamburger and others was a violation of § 5 of the Act.[13]

II. *Enforceability.*

Acknowledging the result in *Frost & Co., supra,* wherein the court enforced a contract involved in an unregistered public offering, Shamburger contends that subsequent lower court decisions [14] and a leading securities law treatise [15] militate against enforceability here. GLMIC neither cites nor discusses *Frost & Co.* and ignores all but one of the authorities cited by Shamburger.

In *Frost & Co.,* the purchaser's assignee sought to enforce the contract and the issuer (which had failed to register a public offering sought to avoid the contract by virtue of its own violation of the Act. The Supreme Court, in reversing the decision of the Supreme Court of Idaho in favor of the issuer, stated (312 U.S. at 41–43, 61 S.Ct. at 416):

No provision of the Act declares that in the absence of registration, contracts in contemplation of or having relation to a public offering shall be void. If there has been no registration, it penalizes the doing of certain designated things—use of the mails, instrumentalities of interstate commerce, etc. It also declares that those who participate in proscribed action shall become liable to purchasers of the securities "who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." These are the sanctions which

---

**12.** GLMIC's brief indicates that there were at least 44 offerees, but that investment in the holding company was limited to 25 "on advice of counsel" and the remainder would be brought in later.

**13.** GLMIC argues that the involvement of 25 investors in the investment corporation exempted the instant transactions from the registration provisions of the Act, citing a 1935 "interpretive opinion" of the SEC's general counsel which listed an offer to "not more than approximately 25 persons" as one which "under ordinary circumstances" would "presumably" not involve a public offering. That opinion, however, listed numerous criteria, pointed out the necessity of considering all the circumstances, and included the statement, "In no sense is the question to be determined exclusively by the number of offerees." Though we would not in any event be bound, of course, by the cited opinion, we find no conflict between it and our holding in the present case, wherein the integrated plan for forming and merging two corporations with 42 investors for the sin-gle purpose of creating a Missouri insurance company was not an "ordinary" condition and wherein GLMIC failed to prove that offers were made only to 25 incorporators or that all of the offerees of the investment corporation had access to the information normally contained in a registration statement.

**14.** Shamburger cites: *Henderson v. Hayden Stone, Inc.,* 461 F.2d 1069 (5th Cir. 1972); *Kaiser-Frazer Corp. v. Otis & Co.,* 195 F.2d 838 (2d Cir.), *cert. denied,* 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952); *Judson v. Buckley,* 130 F.2d 174 (2d Cir.), *cert. denied,* 317 U.S. 679, 63 S.Ct. 161, 87 L.Ed. 545 (1942); and *Corporation Trust Co. v. Logan,* 52 F.Supp. 999 (D.Del. 1943).

**15.** 3 Loss, *Securities Regulation* (2d ed. 1961) 1797–1805 ("Enforceability of Illegal Contracts"). We agree with the author that enforceability, under the circumstances here, is determinable as a matter of federal law.

Congress has definitely provided in order to insure obedience to the statute. When invoked they must be given effect.

Although the challenged contract bears no evidence of criminality and is fair upon its face, we are asked to apply a sanction beyond that specified by declaring it null and void because of relationship to a public offering. The basis for this demand is a supposed federal public policy which requires such annulment in order to secure observance, effectuate the legislative purpose and prevent noxious consequences.

Courts have often added a sanction to those prescribed for an offense created by statute where the circumstances fairly indicated this would further the essential purpose of the enactment; but we think where the contrary definitely appears—actual hindrance indeed of that purpose—no such addition is permissible. The latter situation is beyond the reason which supports the doctrine now relied upon.

Here the clear legislative purpose was protection of innocent purchasers of securities. They are given definite remedies inconsistent with the idea that every contract having relation to sales of unregistered shares is absolutely void; and to accept the conclusion reached by the supreme court below would probably seriously hinder rather than aid the real purpose of the statute.

■ In the present case the roles of the parties are reversed, the issuer, GLMIC, seeking enforcement of an executory subscription agreement, made by an offer and sale which violated § 5 of the Act, while the purchaser seeks avoidance of the agreement. The thread of consistency, however, which runs through *Frost & Co.* and the other cases involving enforceability, is the necessity of implementing the legislative purpose of the Act. In *Frost & Co.* enforceability was permitted because denial would have encouraged violation of the Act and thus have defeated its intent. In sum, the courts are unlikely to permit a violator of the Act to prevail against an offeree having no access to the information required in a registration statement. So here, the legislative purpose of protecting purchasers of securities would be frustrated if the subscription agreement were enforced in favor of GLMIC, a violator of the Act.

GLMIC raises equitable issues, arguing that Shamburger will "have his cake and eat it too" if permitted to escape the agreement when the market price of the stock is below the subscription price, after having been free to purchase the stock at any time its market price might have risen above the subscription price. GLMIC also argues, in effect, that Shamburger should be estopped from asserting the securities law violation because he knew of the non-registration at the time he executed the agreement.[16]

If this were a case of ordinary contract, GLMIC's equity arguments might be persuasive. We deal here, however, with a public policy expressed in a statute. If there be equitable circumstances which might compel enforcement of a subscription agreement in favor of a corporate violator of § 5 of the Act, such circumstances have not been established on this record. The statutory definitions (note 3, *supra*) make the instant agreement itself a security. The initial task of balancing the equities in security transactions has been performed by the Congress.[17]

---

16. Shamburger could have sued for rescission under § 12 of the Act, 15 U.S.C. § 77*l*, within the time limitations specified in § 13 of the Act, 15 U.S.C. § 77m. *Deckert v. Independence Shares Corp.* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). Rather than sue for rescission, Shamburger chose to assert the violation defensively as was done in *Kaiser-Frazer Corp. v. Otis & Co., supra* note 14. Though GLMIC argues failure to rescind, it does not mention, and made no objection at trial to the district court's ruling that the defense was available.

GLMIC neither appealed nor assigned error to that ruling.

17. Our holding here parallels the balance struck in § 14 of the Securities Act of 1933, 15 U.S.C. § 77n:

Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

As has been seen, in *Frost & Co., supra,* the Supreme Court held that a wrongdoer cannot use his own violation of the Act as a shield against liability when sued by an innocent party to the transaction. However, where the wrongdoer sues on the contract, enforcement may properly be denied even though the defendant apparently was aware of the violation and to some extent may have participated therein. *Kaiser-Frazer Corp. v. Otis & Co., supra.*

The judgment is reversed and the case remanded to the district court with directions to enter judgment for defendant.