**UNITED STATES of America, Plaintiff,**

v.

**Thomas R. LARKINS and Herbert M. Larkins, Defendants.**

No. 84–0044–P(J).

United States District Court,
W.D. Kentucky,
Paducah Division.

Jan. 16, 1987.

78

David E. Dearing, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

J. William Phillips, Murray, Ky., for defendants.

## MEMORANDUM OPINION

JOHNSTONE, Chief Judge.

■ This action arises out of alleged violations of Section 301(a) of the Clean Water Act (CWA), 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants into "navigable waters"—defined as the "waters of the United States" and including adjacent freshwater wetlands [1]—unless authorized by permit issued by the Army Corps of Engineers (Corps) pursuant to Section 404, 33 U.S.C. § 1344. The United States contends that Defendants Thomas R. and Herbert M. Larkins, brothers who own and operate a farm in Carlisle County, Kentucky, constructed earthen dikes and levees on wetlands adjacent Obion Creek without a permit, thereby damaging the aquatic environment and causing harm to fish and wildlife resources.[2] In remedy of these

---

**1.** 33 U.S.C. § 1362(7); *see* note 2, *infra.*

**2.** The property in question, which is described in Book 70, page 332, Office of the Clerk of Carlisle County, Kentucky, lies north of Obion Creek, south of Highway 80 and approximately three miles east of U.S. Highway 51, and is within the flood plain of Obion Creek, a tributary of the Mississippi River. Tributaries of navigable rivers are "waters of the United States" over which the Corps exercises jurisdiction for the purpose of enforcing the CWA. 40 C.F.R. § 230.3(s)(5). The term "waters" also encompasses wetlands adjacent to rivulets like

Obion Creek. *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 461–466, 88 L.Ed.2d 419 (1985). Consequently, if the property on which the Larkins constructed dikes and levees contained wetlands, the Corps had authority to regulate the discharge of any pollutants thereon.

In an Order entered January 8, 1986, this court found that the Larkins erected dikes and levees with earthmoving equipment. Earthmoving equipment constitutes a "point source"—i.e., an instrumentality through which pollutants can be introduced into waters of the United

violations, the United States seeks restoration of the site, a permanent injunction against future violations of the CWA, and imposition of a $20,000 penalty under 33 U.S.C. § 1319(b), (d).

The Larkins, who acquired title to the site in 1976, do not deny constructing the dikes and levees. Nor do they claim ignorance of the permit requirement.[3] Rather, they argue that the property in question does not contain wetlands as defined by 33 C.F.R. § 323.2(c),[4] and that even if it does, their use of the land qualifies for a permit exemption under 33 U.S.C. § 1344(f).[5]

This matter was tried before the court without a jury on January 14–15, 1986. At trial, the United States called six witnesses qualified as experts in soil analysis, surveying, forestry, wildlife biology, and wetland delineation. The defense called the defendants, two neighboring farmers, and an expert botanist. Approximately 50 exhibits were introduced including correspondence between the parties, photographs of the disputed site, experts' reports, and technical materials used by the Corps in identifying wetlands. The court, having studied the parties' arguments and reviewed the evidence, enters these findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52(a). To the extent that these findings of fact constitute conclusions of law, they are adopted as such, and to the extent that the conclusions of law constitute findings of fact, they are so adopted.

## I. FINDINGS OF FACT

### A. HISTORY OF THE SITE

The record contains a detailed history of the parcel on which the Larkins constructed their dikes and levees. The Larkins acquired the site in 1976 with the purchase of a 550 acre tract lying along Obion Creek. At the time of purchase, Thomas Larkins observed that as many as 10 to 12 acres of the site were covered knee-deep with water. He noted the presence of oak, hickory, and other bottomland hardwoods, but also observed cypress on the site. After inspecting the inundated parcel, Larkins concluded that beaver, reintroduced to the area in 1950 by the Kentucky Department of Fish and Wildlife Resources, were responsible for poor drainage.

After acquiring the property, the defendants dug drainage ditches, cut back dead and damaged timber, blasted out beaver dams and lodges, and began filling gullies and washouts. Site improvements continued without interruption until May 9, 1979, when Mr. L.D. Blanchard, an attorney for the Corps, requested permission to make an inspection. Blanchard's verbal request was followed by a written one (Plaintiff's Exhibit 3) to which Defendant Thomas Larkins responded in writing on June 28, 1979: "We will let two men from the Corps come on a part of our land if one of them is the BOSS [and if] he can answer my questions." Plaintiff's Exhibit 4.

States—under Section 502(14) of the CWA, 33 U.S.C. § 1362(14). The court further found that the dikes and levees were made of earth. Earth, when used as a fill material in the construction of structures such as impoundments or dikes on wetlands, constitutes a "pollutant" under the CWA. *See* Section 502(6), 33 U.S.C. § 1362(6); 33 C.F.R. § 323.2(k) and (*l*); *United States v. Weisman*, 489 F.Supp. 1331, 1336–1337 (M.D. Fla.1980), *aff'd* 632 F.2d 891 (5th Cir.1980). *See also Minnehaha Creek Watershed District v. Hoffman*, 597 F.2d 617, 625–626 (8th Cir.1979). Consequently, if the Larkins' property contained wetlands, the use of earthmoving equipment to construct earthen dikes and levees thereon constituted a discharge of pollutants into waters of the United States, an act prohibited without a permit unless statutorily exempted from the Corps' control. *See* page 85, *infra*.

Although the Larkins deny that their property contained wetlands, they have not challenged

the legal consequences of such a finding. Consequently, if their property contained wetlands, and if construction of dikes and levees thereon does not qualify for a permit exemption, the Larkins are liable for violations of the CWA.

3. The Government's complaint alleges that permit violations began in 1978 when the Larkins were arguably unaware of the CWA's permit requirement. In pretrial stipulations, however, the parties agreed that the instant action addresses only those violations alleged to have occurred during or after 1980 by which time the Larkins were fully aware of the requirements of the Act.

4. *See* page 80, *infra*.

5. *See* page 85, *infra*.

On July 31, 1979, the Corps dispatched Colonel William H. Reno to meet with the Larkins and a group of neighboring landowners in Carlisle County. After explaining the Corps' enforcement responsibilities under the CWA, Reno renewed the inspection request. The Larkins refused, informing Reno that they would consider the request only after he divulged the identity of the person responsible for reporting their activities to the Corps. Reno rejected the Larkins' terms and, on November 23, 1979, informed them that the matter had been turned over to the Justice Department. Plaintiff's Exhibit 8.

In 1980, ignoring the Corps' still pending inspection request, the Larkins began construction of the contested dikes and levees. On February 1, 1982, the Corps notified Thomas Larkins that aerial inspection had revealed "unauthorized deposition of material into water of the United States," a violation of the CWA. Plaintiff's Exhibit 10. Disregarding the Corps' objections, the Larkins completed construction of the dikes and levees, forming an 18 acre impoundment designed to capture upland drainage. Before construction of the dikes and levees, upland runoff often inundated the low lying lands adjacent Obion Creek.[6] By creating the impoundment, the Larkins were able to cultivate formerly inundated lowlands.[7]

On February 10, 1984, after completion of the dikes and levees and almost five years after the Corps made its initial inspection request, the Justice Department filed an action against the Larkins in this court. Thereafter, the court ordered two on-site inspections of the Larkins' property—the first on August 30, 1984, and the second on May 29, 1985. The results of those inspections are discussed below.

### B. IDENTIFICATION OF WETLANDS

In 1972, with passage of the Federal Water Pollution Control Act Amendments, 86 Stat. 816, Congress empowered the Corps to issue regulations for enforcement of the CWA. The Corps' current regulations, which have survived scrutiny by the Supreme Court,[8] define wetlands as:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

33 C.F.R. § 323.2(c).[9] This definition focuses on two essential indicia of wetlands: hydrology and vegetation.

In most instances of alleged violations of the CWA involving land adjacent to waters of the United States, the Corps is immediately admitted to the site to conduct hydrological and vegetation studies, thus enabling it to make a timely determination of

---

6. *See:*

> *Plaintiff's Exhibit 19:* aerial photograph made by the Soil Conservation Service in 1964. In this photograph, taken 16 years before construction of the dikes and levees, the future impoundment area appears less forested than the surrounding acreage.
> *Plaintiff's Exhibit 20:* aerial photograph made in 1972, again showing reduced density of mature timber on the lowland areas adjacent Obion Creek.
> *Plaintiffs' Exhibit 22A and B:* aerial photographs made by the Corps in 1979 showing the inundation of the site immediately before the construction of the disputed dikes and levees.
> *Plaintiff's Exhibit 23A, B, C, D:* aerial photographs made in 1980. Pooled water and dying timber readily apparent.
> *Plaintiff's Exhibit 24A, B, C, D:* aerial photographs showing inundation of the site in December of 1981.

7. *See:*

> *Defendants' Exhibit 33:* photograph, made in August 1984, showing successful cultivation of soybeans in a formerly inundated area.
> *Plaintiff's Exhibit 25:* aerial photograph made in September of 1984 showing completed dikes and levees and the impoundment area created thereby. The photograph also reveals cultivation of fields adjacent the impoundment area.

8. *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

9. This definition is quoted from regulations issued in 1982. The language is identical to that used in the 1977 regulations which were in force at the time of the Corps' first contact with the Larkins.

whether wetlands are present. In a few instances, however, vegetation is removed and drainage patterns are altered before the Corps can make an on-site inspection. In such instances, of which this case is one, other means must be called upon to determine whether wetlands were present on a site prior to the commencement of landowner improvements. Two of those means are soil analysis for determining the likely hydrology of a site prior to landowner alterations,[10] and aerial photography for memorializing drainage patterns and vegetation types when a timely on site inspection is not possible.[11] Because the Larkins refused to allow an on-site inspection before completion of the dikes and levees, the court's findings of fact regarding hydrology and vegetation are based on soil analysis and aerial photography.

10. *See* Newling testimony, Transcript, Vol. 1, p. 51.

11. Aerial photography has been recognized as a reliable substitute for on-site "prefill" vegetation tallies, *United States v. Robinson,* 570 F.Supp. 1157, 1161 (M.D.Fla.1983), and has been used as a means of memorializing wetland growth for future comparison. *Barcelo v. Brown,* 478 F.Supp. 646, 685 (D.P.R.1979), *aff'd in part, vacated in part,* 643 F.2d 835 (1st Cir.1981), *rev'd on other grounds,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

12. The approximate location, shape, and size of the areas to the east, northeast, and southwest of the impoundment are depicted on Plaintiff's Exhibit 29. The impoundment and outlying areas affected by the dikes and levees encompass about 110 acres. Transcript, Vol. 4, p. 20.

13. *See, e.g.,* Plaintiff's Exhibit 24A, which shows water standing on the site of the impoundment area and also on the area east of the impoundment with water pooled on the area northeast of impoundment. Plaintiff's Exhibit 24C shows water pooled on area southwest of impoundment.

The defendants argue that the Corps' investigation of the hydrological characteristics of their property is incomplete because the Corps' experts failed to determine the frequency and duration of inundation of the site. The Corps' regulations do not require such a finding; rather, the Corps need only prove that an area is "saturated ... at a frequency and duration *sufficient to support"* a prevalence of wetland vegetation. 33 C.F.R. § 323.2(c) (emphasis added). In other words, if an area is sufficiently saturat-

## 1. HYDROLOGY

Evidence of soil saturated by surface or ground water is essential for positive wetland identification. At trial, the Corps' experts testified that the impoundment area and areas east, northeast, and southwest thereof possess this hydrological characteristic.[12]

Aerial photographs, described *supra* note 6, attest to repeated inundation of the property prior to construction of the dikes and levees.[13] Soil analysis performed by Charles Newling, an expert presently in charge of training Corps personnel in the use of soil analysis for wetland identification, revealed that the impoundment area and the area lying southwest thereof contained hydric soil. Hydric soil is a wetland soil type which is low in oxygen and formed under saturated conditions.[14] Be-

ed to support wetland vegetation, the frequency and duration of the inundations which created the saturated conditions are irrelevant.

14. The Memphis District's *Wetland Identification and Classification Guidelines for Section 301 of the Clean Water Act of 1977,* as revised by the Corps in December 1980, states that "wetland soils are hydric soils [which], for a significant portion of the growing season, are virtually free of dissolved oxygen in the major portion of the root zone.... Hydric soils thus tend to support vegetation typically adapted for life in saturated soil conditions." Defendants' Exhibit "Keller B" at 11; Transcript, Vol. 2, p. 10.

During the August 30, 1984, inspection, Newling made ten soil tests around the perimeter of the impoundment area. Tests on the north, east, and west sides of the impoundment—holes A, B, C, D, H, I, and J on Plaintiff's Exhibit 25—revealed hydric soil. Tests along the southern side of the impoundment—holes E, F, and G—uncovered non-saturated soils. The characteristics of soil change very slowly, *see infra* note 15; consequently, the presence of non-saturated soil on the southern border of the impoundment does not necessarily exclude the site from classification as a wetland. Aerial photographs show that the site was often inundated. If the inundations were of sufficient frequency to support wetland vegetation, the southern side of the impoundment was a wetland area too.

During the May 29, 1985, inspection, Newling made nine additional soil tests centered on the area southwest of impoundment area. Only one of the ten suggested non-saturated soil. Newling observed silt marks on the trunks of trees in this area indicating flooding. Transcript Vol. 1, p. 66. And, on cross-examination,

cause wetland plants, which require less oxygen than their upland rivals, are uniquely adapted for growth in hydric soil, Newling's soil analysis is a strong, though not conclusive, indicator that the impoundment and southwest areas are wetlands.[15] Although Newling was unable to perform soil tests in the areas east and northeast of the impoundment, a soil analysis by Thomas Welborn, an expert for the Environmental Protection Agency (EPA), revealed that the eastern area contained hydric soil, and a soil survey made by the United States Department of Agriculture's Soil Conservation Service in 1937 attests that hydric soil types dominate the northeastern area.[16]

Although the defendants presented no expert challenge to the Corps' soil analysis, the defendants did present testimony from two individuals—Messrs. W.R. Tyler and M.H. Mix—who had witnessed inundation of the property for fifty years. The testimony of these witnesses in no way impeached the conclusions of the Corps' experts regarding the predominance of saturated soil types on the site.

 Where experts present unequivocal, uncontradicted, unimpeached testimony on a technical matter beyond the competence of lay determination, a court cannot lightly disregard the experts' conclusions. *Webster v. Offshore Food Service, Inc.*, 434 F.2d 1191, 1193 (5th Cir.1970); *Stafos v. Missouri Pacific Railroad Company*, 367 F.2d 314, 317 (10th Cir.1966). When, as here, those conclusions are presented by officials charged with the administration and enforcement of the CWA, they are entitled to even greater deference. *United States v. Lambert*, 589 F.Supp. 366, 370 (M.D.Fla.1984). Consequently, the court

finds that the impoundment area and areas east, northeast, and southwest thereof possessed hydrological characteristics typical of those associated with wetlands.

## 2. VEGETATION

The Corps' regulations state that, under "normal circumstances," wetlands support "a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 323.2(c). Normal circumstances end when a landowner's activities modify the hydrological conditions of a site, and ended on the Larkins' property in 1980 with construction of the dikes and levees. Thus, to determine whether the Larkins' property supported a prevalence wetland vegetation under normal circumstances, the court must determine what type of vegetation dominated the site prior to construction of the dikes and levees.

The Larkins refused to allow inspection of their property prior to construction of the dikes and levees; consequently, no on-site vegetation tally exists for the critical period before 1980. There being no prefill, on-site vegetation tally, the court must rely on aerial photographs to determine what type of vegetation formerly dominated the site.[17]

At trial, experts trained in wetland identification and photo interpretation testified that aerial photographs made in 1980 indicated a prevalence of wetland vegetation on the 110 acre site affected by the Larkins construction activities. Transcript, Vol. 3, pp. 24, 112. Although the experts conceded that conclusive identification of particular plant species could not be made on the basis of the aerial photographs, they

---

Thomas Larkins confirmed that, prior to erection of the levee which separates the southwestern area from the impoundment, run-off water from the northeastern area would flood the southwestern area. Transcript, Vol. 4, p. 70–71.

15. On cross-examination, Mr. Newling admitted that soil composition changes gradually. So gradually, in fact, that upland soil may be inundated for centuries without losing its upland chemistry. Transcript, Vol. 2, pp. 24–25, 32–34. By the same token, the hydric soil on the Larkins' property could be cultivated for decades, but it would still test hydric when analyzed.

*Id.*, p. 23. Given the glacial pace at which soil types change and the fact that recent changes in land use are not reflected by soil analysis, Newling's finding that hydric soil predominates on the Larkins' property is not, by itself, a sufficient basis upon which to declare that the impoundment and surrounding areas are wetlands. A corroborative finding of wetland vegetation is required.

16. *See* Plaintiff's Exhibit 26; *see also* Transcript, Vol. 1, pp. 72–81.

17. *See* notes 6 & 11, *supra.*

informed the court that the "signature" of the vegetation in the photos—its color, shading, tint and texture—indicated a prevalence of wetland vegetation on the site. *Id.* Using Plaintiff's Exhibit 23B, one of the aerial photographs made in 1980, expert Martin Keller was able to identify "an area of black willow, button bush and several species of herbaceous aquatic and semi-aquatic plants," all typically associated with wetlands. Transcript, Vol. 3, p. 24. Keller also noted that the photograph was "typical of the many thousands of similar sites that we have seen over the last 10 years of areas such as this, and in every case these areas have been classified as wetlands." *Id.* An on-site vegetation tally made by EPA's Thomas Welborn in 1984 after completion of the dikes and levees confirmed Keller's conclusion. During that inspection, Welborn located an area of undisturbed vegetation north of the impoundment. The undisturbed area was dominated by wetland plant species and its signature matched the signature of the vegetation extending "from the impoundment basically up to the east, northeast of the property" in the 1980 photographs. Transcript, Vol. 3, pp. 110, 111–112, 116. By these means, plaintiff's experts established that a prevalence of wetland vegetation grew in the impoundment area and in the areas east and northeast thereof prior to construction of the dikes and levees.

In May 1985, David Parson, a wildlife biologist for the Fish and Wildlife Service, joined experts Keller and Welborn in making a vegetation tally for the area lying southwest of the impoundment. *See* Transcript, Vol. 3, p. 34–35. With the exception of two narrow ridges where the predominant vegetation consisted of trees not generally found in wetlands, the predominant vegetation on the southwest area was of a type requiring saturated soil conditions for growth, or which was adapted to and could tolerate such soil conditions. *Id.* at 39. By this means, plaintiff's experts established that wetland vegetation prevailed on the area southwest of the impoundment.[18]

18. At trial, the defendants carefully cross-examined Martin Keller on the meaning of vegetation tally sheets completed during the 1985 inspection of the area lying southwest of the impoundment. Transcript, Vol. 3, pp. 69–77; Plaintiff's Exhibit 15. The plants recorded on the tally sheets were organized in accordance with wetland identification guidelines authored by Keller. *See* note 14, *supra.* The guidelines divide plants into three groups:

*Group 1.* These species are considered to be the most water tolerant woody species in the District. While the presence of these species on a site does not insure the presence of wetlands, these species are generally consistent as to the sites where they are commonly found (swamps, sloughs and backwater flats).

*Group 2.* This group includes those species that, while showing varying degrees of adaptation to life in saturated soil conditions, may also be commonly found on more mesic sites which would not be considered wetlands.

*Group 3.* These species may on occasion be found in wetlands, but are not considered to be typically adapted for life in saturated soil conditions (where these species are well established, wetlands are not present).

Defendants' Exhibit "Keller B" at 2; Transcript, Vol. 2, p. 64.

The vegetation recorded on the first tally sheet, which is summarized by group in Defendants' Exhibit "Keller A", shows a prevalence of Group 2 plants, followed, in order of prominence, by groups 3 and 1. Similar patterns of prominence were recorded on seven of sixteen additional tally sheets, but in each case the number of plants in groups 1 and 2, considered together, exceeded the number of plants in Group 3. In cross-examining Keller, the defendants sought to suggest that where Group 3 plants outnumber Group 1 plants, wetlands are not present, for, quoting the Corps' wetland identification guidelines, "where [Group 3] species are well established, wetlands are not present." Defendants' Exhibit "Keller B" at 2. In authoring that classification system, however, Keller wrote that both groups 1 and 2 "include those woody species which are believed to be typically adapted for life in saturated soil conditions." In other words, tallies for both groups 1 and 2 should be combined when determining whether a site supports a predominance of plants adapted for life in saturated soil conditions. Defendants' Exhibit "Keller B" at 2; *see also* Transcript, Vol. 3, p. 75. Applying this standard with due deference to Keller's position as its author and best interpreter, the tally sheets establish a prevalence of wetland vegetation in the area southwest of the impoundment.

Importantly, the Corps' guidelines
do not preclude the investigator from delineating as wetlands sites not dominated by Group 1 species. However, the field investigator should properly document that presence of hydric soils, any available background on hydrologic conditions and any other information that would support the conclusion reached.

Defendants' Exhibit "Keller B" at 13. Plaintiff's field experts followed this guideline in confirm-

At trial, defendants' expert Prof. Otto Ohmart, Herbarium Curator at Southeast Missouri State University, introduced the results of a detailed floral survey made during an inspection of the area southwest of the impoundment on August 26, 1985. After analyzing five 50–foot–by–50–foot quadrants selected by the defendants, Ohmart concluded that mesic rather than saturated soils dominate the site and that "the area consists of a variety of plants typical of both upland and bottomland ... [which] can survive in either place." Defendants' Exhibit 1.

Ohmart's first conclusion—that mesic soil dominates the site—is not based on actual soil analysis, but on an inference drawn from a reference work entitled *Flora of Missouri*. That work lists the *preferred* habitat of local flora but, by Ohmart's own admission, cannot be relied upon for determining the type of soil in which plants actually grow. Transcript, Vol. 4, pp. 146, 167–168. Ohmart's second conclusion—that much of the vegetation on the site can survive in both uplands and bottomlands—is consistent with the Government's findings, for many plants "adapted for life in saturated soil conditions" can also survive in unsaturated soils. *See* note 18, *supra*. Thus, the defendants' expert does not refute the plaintiff's evidence that the area southwest of the impoundment contains wetlands.

The Larkins' failure to establish the hydrological characteristics of the site through soil analysis coupled with their failure to classify plants on the basis of their ability to adapt to saturated soil conditions rather than on the basis of their preferred habitat belies a failure to understand the Corps' criteria for wetland identification, criteria which control the deliberations of this court. The Larkins' argument is straightforward: upland plants prefer well drained soils; the southwest area contains upland plants; therefore, the southwest area is well drained and does not support vegetation adapted for life in saturated soil conditions. In offering the environmental preferences of upland plants as conclusive evidence of well drained soil incapable of supporting wetland vegetation, the defendants have ignored the plaintiff's soil analyses and vegetation tallies.

### C. FINAL FINDING OF FACT

As discussed earlier, Congress empowered the Corps to issue regulations establishing criteria for wetland identification.[19] A court must faithfully apply those criteria and may not substitute its own or those of a defendant when considering a question of wetland delineation. *See Chevron, U.S.A., Inc. v. Natural Resources Defense*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The United States has proved each of the wetland elements described in 33 C.F.R. § 323.-2(c) for each of the four areas affected by construction of the dikes and levees in 1980. The Larkins, however, have not challenged the plaintiff's expert soil analyses, nor have they presented evidence which overcomes the Government's proof that a prevalence of the plants growing on the site prior to 1980 were adapted to saturated soil conditions and that a prevalence of such vegetation still exists on the area southwest of the impoundment. Accordingly, the court finds that the United States has proved, by a preponderance of the evidence,[20] that the impoundment area and the areas east, northeast, and southwest thereof are wetlands.

### II. CONCLUSIONS OF LAW

The property on which the Larkins constructed the dikes and levees and

---

ing their wetland findings by soil analysis. Thus, although the vegetation tallies from the area southwest of the impoundment showed a dominance of Group 2 rather than Group 1 species, the area was properly delineated as wetlands supporting a predominance of vegetation adapted to saturated soil conditions.

19. *See* page 81, *supra*.

20. The burden of persuasion on the Government in a wetlands case is proof by a preponderance of the evidence. *United States v. Lambert*, 589 F.Supp. 366, 370 (M.D.Fla.1984), citing *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) and *United States v. Regan*, 232 U.S. 37, 47, 34 S.Ct. 213, 216, 58 L.Ed. 494 (1914).

the adjoining property affected by that construction are wetlands. Wetlands are a part of the waters of the United States which are protected by the CWA. *United States v. Riverside Bayview Homes*, 474 U.S. 121, 106 S.Ct. 455, 461–466, 88 L.Ed.2d 419 (1985). The CWA prohibits discharges of pollutants into waters of the United States without a permit from the Corps. 33 U.S.C. § 1311(a). The use of earthmoving equipment to construct earthen dikes and levees on wetlands constitutes a discharge of pollutants into waters of the United States for which a permit is required.[21] The Larkins did not secure a permit prior to construction of the dikes and levees which formed the impoundment. Consequently, unless that construction qualified for a statutory exemption to the permit requirement, the Larkins violated the CWA.

### III. THE FARM EXEMPTION

 The United States has proven a prima facie violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The burden of proof now shifts to the defendants[22] to show that their construction activities qualify for an exemption under 33 U.S.C. § 1344(f), which states:

(1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material—

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;
[or]

(C) for the purpose of construction and maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

. . . . .

is not prohibited by or otherwise subject to regulation under ... section 301(a) ... of this Act....

(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

 The Larkins claim exemptions for harvesting forest products, for promoting upland soil conservation, and for construction of a stock pond. They are not entitled to those exemptions. They constructed the dikes and levees for the purpose of bringing the wetlands adjacent Obion Creek under cultivation, a use to which the site was not previously subject.[23]

---

**21.** See note 2, *supra.*

**22.** Although no court has ruled on which party bears the burden of proof when an exemption is claimed under 33 C.F.R. § 323.4, a review of federal cases reveals that the burden of proving an exemption to a regulatory statute is consistently placed on the party who claims the exemption. *See Larson v. Valente*, 456 U.S. 228, 255 n. 30, 102 S.Ct. 1673, 1689 n. 30, 72 L.Ed.2d 33 (1982) (parties claiming an exemption from regulatory statutes may be required to prove they qualify); *U.S. v. An Article of Device*, 731 F.2d 1253, 1262 (7th Cir.1984) (burden of proving an exemption is on the defendant if government access to information has been limited); *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C.Cir.1978) (government bears burden of proving exemption from provisions of Freedom of Information Act); *Gen'l Life of Missouri v. Shamburger*, 546 F.2d 774, 781 (8th Cir.1976) (defendant bears burden of proving statutory exemption from provisions of a remedial statute). Given the

limited access plaintiff's experts had to the Larkins's property and acknowledging the remedial nature of the Clean Water Act—"The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters," 33 U.S.C. § 1251(a)—the burden of proving an exemption must fall on the defendants.

**23.** The Corps' regulations clarify an important question raised in the defendants' post trial briefs: If the wetlands were cultivated or logged before beaver entered the region and upset the natural drainage of the property, do cultivation and silviculture constitute uses to which the land was "previously subject"? The answer is no, for activities subject to the farm exemption qualify for exemption only if they are established and "on-going". 33 C.F.R. § 323.-4(a)(1)(ii). Activities cease to be established when the property on which they were once conducted "has been converted to another use or *has lain idle so long that modifications to the*

In clearing and cultivating that acreage, the defendants reduced the reach of wetlands, thereby reducing the reach of the navigable waters of the United States.[24] Consequently, the defendants' activities do not qualify for a farm exemption, for they exceeded the limiting conditions imposed by 33 U.S.C. § 1344(f)(2).

## IV. REMEDIES

The court finds that the construction of dikes and levees without a permit on wetlands adjacent Obion Creek violated 33 U.S.C. 1311(a), and further finds that the defendants' activities do not qualify for a farm exemption under 33 U.S.C. 1344(f). Having found a violation of the Clean Water Act, the court must order appropriate relief. The United States asks for restoration of the site, a permanent injunction against future violations, and imposition of a $20,000 penalty under 33 U.S.C. § 1319(b), (d).

■ The United States is entitled to restoration of the site. The Larkins were aware of the permit requirement before they began construction of the dikes and levees. Nevertheless, they elected to deny the Corps access to their property and proceeded with construction of the dikes and levees over the Corps' objections. The Larkins incur no liability for exercising their right to refuse the Corps entry onto their land; rather, they incur liability for acting in violation of the CWA, a violation which could have been avoided had they cooperated with the Corp.

■ Wetlands are considered an invaluable but dwindling natural resource. They improve the water quality of our streams, lakes, and rivers by trapping sediment, sewage, and other pollutants, and help stabilize erosion and support wildlife. Congress has determined that "the systematic destruction of the Nation's wetlands is causing serious, permanent ecological damage," damage so egregious that wetlands merit protection by laws like the CWA which promotes the restoration and maintenance of wetland resources. STAFF OF SENATE COMM. ON THE ENVIRONMENT, 95TH CONG., 2D SESS., A LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977, 869–870 (Comm. Print 1978) (Statement of Sen. Muskie). For these reasons, the court concludes that public policy interests will be served best by restoration of the site.[25] Accordingly, the court shall order the defendants to carry out the restoration plan described by Plaintiff's Exhibit 30.[26] The court will also impose a monetary penalty for violation of the CWA and will enter a permanent injunction prohibiting future modification of the site without permission from the Corps. An appropriate Order of Judgment encompassing these remedies shall be entered with this Memorandum Opinion.

## ORDER OF JUDGMENT

For the reasons stated in the Memorandum Opinion this day entered, the court

---

hydrological regime are necessary to resume operations...." *Id.* (emphasis added). Reducing the reach of the Obion wetlands required modification of the site's hydrological regime. Consequently, even if the wetlands had a history of farm use, that use was no longer established at the time the Larkins' built the dikes and levees, and "reclamation" of the site brought "an area of the navigable waters into a use to which it was not previously subject." 33 U.S.C. § 1344(f)(2). *Cf.* 33 C.F.R. § 323.-4(a)(1)(iii)(C)(2).

**24.** *See* note 2, *supra.*

**25.** There are numerous precedents for restoration. *United States v. Tull,* 615 F.Supp. 610, 626–627 (E.D.Va.1983), aff'd, 769 F.2d 182 (4th Cir.1985); *United States v. Bradshaw,* 541 F.Supp. 884, 886 (D.Md.1982); *United States v.*

Board of Trustees of Florida Keys Community College, 531 F.Supp. 267, 275–276 (S.D.Fla.1981); *United States v. Weisman,* 489 F.Supp. 1331, 1349 (M.D.Fla.1980).

**26.** The plan depicted by Plaintiff's Exhibit 30 calls for the following: (1) removal of the dike around the impoundment by pushing it into the surrounding ditch; (2) removal of culverts from the bank of Obion Creek; (3) removal of most of the levee extending from the southeastern side of the impoundment by pushing it into a parallel ditch; (4) breaching the levee which extends southwest from the impoundment with 10-foot wide gaps every 100 feet; and (5) placement of any excess material in a non-wetland area.

has found that Defendants Thomas R. and Herbert M. Larkins have violated Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and that the United States is entitled to relief therefrom. Accordingly:

1. The defendants are permanently enjoined from making modifications to the wetland sites adjacent Obion Creek in Carlisle County, Kentucky without first securing an appropriate permit from the Army Corps of Engineers in accordance with 33 U.S.C. § 1344.

2. The defendants shall, within six months from date, complete the restoration plan depicted on Plaintiff's Exhibit 30. The plan requires removal of the dike which forms the impoundment by pushing it into a surrounding ditch, removal of culverts from the bank of Obion Creek, removal of most of the levee extending from the southeastern side of the impoundment by pushing it into an existing parallel ditch, breaching the levee which extends southwest from the impoundment with 10–foot wide gaps every 100 feet, and placement of any excess material in a non-wetland area. The defendants shall consult with the plaintiff should they need further clarification of the plan.

3. The defendants are fined the sum of forty thousand dollars ($40,000.00), payable six months from date, provided, however, that the penalty will be lifted if the defendants complete the above ordered restoration plan before payment is due.

IT IS SO ORDERED AND ADJUDGED.